JACQUELINE MICKEY *v.* DARRELL D. MICKEY
(SC 18126)

Rogers, C. J., and Norcott, Katz, Zarella and Schaller, Js.

Argued September 16, 2008—officially released July 21, 2009

*Campbell D. Barrett*, with whom were *Jon T. Kukucka* and, on the brief, *C. Michael Budlong*, *Kevin W. Hadfield* and *Felicia C. Hunt*, certified legal intern, for the appellant (defendant).

*Steven R. Dembo*, with whom, on the brief, were *P. Jo Anne Burgh* and *Barbara D. Aaron*, for the appellee (plaintiff).

*Opinion*

ZARELLA, J. The principal issue in this appeal is whether disability benefits awarded under General Statutes § 5-192p[1] as a result of a disability incurred after a marriage has been dissolved constitute distributable marital property under General Statutes § 46b-81.[2] The defendant, Darrell D. Mickey, appeals[3] from the trial court's judgment denying his motion for clarification of that court's financial orders, pursuant to which the

---

[1] General Statutes § 5-192p provides in relevant part: "(a) If a member of tier II, while in state service, becomes disabled as defined in subsection (b) of this section, prior to age sixty-five, he is eligible for disability retirement if the member has completed at least ten years of vested service. If a member of tier II, while in state service, becomes so disabled as a result of any injury received while in the performance of his duty as a state employee, he is eligible for disability retirement, regardless of his period of state service or his age. . . ."

[2] General Statutes § 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage . . . the Superior Court may assign to either the husband or wife all or any part of the estate of the other. . . .

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after hearing the witnesses, if any, of each party . . . shall consider the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

[3] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

plaintiff, Jacqueline Mickey, was granted 40 percent of the defendant's monthly retirement benefits. On appeal, the defendant claims that, in denying his motion for clarification, the trial court improperly concluded that it had authority under § 46b-81 to distribute the defendant's potential disability benefits at the time of dissolution. Specifically, the defendant contends that his disability benefits did not constitute distributable property under § 46b-81 because, at the time of dissolution, such benefits were no more than a mere expectancy and not a sufficiently concrete interest. The defendant also asserts that his disability benefits are not distributable because they were not actually awarded until after the date of dissolution, and they represent a substitute for lost wages rather than deferred compensation. We agree with the defendant that his disability benefits are beyond the scope of property subject to distribution under § 46b-81 and, accordingly, reverse the judgment of the trial court.

The record reveals the following relevant facts and procedural history. The marriage of the parties was dissolved on September 21, 2001. At the time of dissolution, the defendant had been employed by the state of Connecticut as a correction officer for approximately fourteen years. Pursuant to his employment with the state, the defendant was enrolled in tier II of the state employees retirement system. See General Statutes § 5-192e et seq. Due to the nature of his job, the defendant potentially was eligible for hazardous duty retirement under General Statutes § 5-192n,[4] and, as with all other state employees enrolled in tier II, also was eligible for normal retirement benefits under General Statutes § 5-192*l*, and disability retirement benefits under § 5-192p

---

[4] General Statutes § 5-192n provides in relevant part: "(a) Each 'hazardous duty member' who has completed twenty-five years of credited service while a hazardous duty member may be retired on his own application on the first day of any future month named in the application. . . ."

in the event that he became disabled during the course of his employment.

In its memorandum of decision issued in conjunction with the dissolution of the parties' marriage, the trial court, *Dyer, J.,* ordered that "[t]he plaintiff shall be entitled to, and the defendant's . . . pension plan shall pay to her, 40 percent of the defendant's monthly retirement benefit payment. It is the court's intention that the plaintiff receive 40 percent of the defendant's monthly retirement benefit payment under the contributory hazardous duty retirement plan should he qualify for [the] same, or 40 percent of the defendant's monthly retirement benefit payment under the noncontributory tier II plan should he fail to qualify for a hazardous duty pension." Despite specifically distributing the defendant's potential hazardous duty retirement benefits, however, the trial court did not mention any potential disability benefits that the defendant may have subsequently become entitled to under the plan.

Following the dissolution of the parties' marriage, the defendant suffered an injury in the course of his employment on February 28, 2002, which rendered him disabled and eventually forced him to retire. The defendant began receiving retirement benefits under the state employees retirement system in June, 2005, which was made retroactive to July 1, 2003, in the amount of $990 per month.[5] The defendant's monthly benefit subsequently was increased to $2382.30 in November, 2005, in recognition of the enhanced[6] benefit that he was

---

[5] The record indicates that, in addition to his initial monthly payments, the defendant also received an initial lump sum payment from the state in June, 2005, to compensate him for the retirement benefits to which he was entitled from the date of his retirement, July 1, 2003, until the time that his retirement went into pay status in May, 2005.

[6] Nancy Wilson, a supervisor in the office of the state comptroller, testified that, upon certification of his disability, the defendant was statutorily entitled to receive an enhanced retirement benefit under the state employees retirement system, which was calculated on the basis of a statutorily prescribed formula and included a minimum guaranteed benefit of 60 percent of the defendant's salary at the time of disability.

entitled to receive as a result of the state's certification of his disability under § 5-192p.[7] The plaintiff thereafter continued to receive 40 percent of the defendant's entire monthly benefit payment, including that portion attributable to the defendant's disability benefits.

The defendant subsequently filed a motion for clarification on January 13, 2006, requesting that the trial court clarify that (1) it did not intend to distribute the defendant's disability benefits as part of its original financial orders, and (2) regardless of its intent, the trial court did not have the statutory authority to distribute those benefits because they were acquired after dissolution. After the trial court, *Solomon, J.*, denied the plaintiff's motion to dismiss the defendant's motion for clarification, the trial court, *Dyer, J.*,[8] subsequently denied the defendant's motion for clarification, concluding, on the basis of our decision in *Travelers Ins. Co.* v. *Pondi-Salik*, 262 Conn. 746, 817 A.2d 663 (2003), that the defendant's disability benefits properly were characterized as being part of his retirement benefits, which the trial court clearly and unambiguously had distributed as part of its financial orders. The trial court further determined that, because retirement benefits are properly distributable under § 46b-81, the court had the authority to distribute those retirement benefits attributable to the defendant's disability, and that the defendant, therefore, was not entitled to any relief. This appeal followed.

I

As an initial matter, the plaintiff claims that the defendant's appeal is procedurally improper and, therefore,

[7] The defendant again was awarded a onetime lump sum payment to compensate him retroactively for the enhanced benefits to which he was entitled to from his retirement in July, 2003, until the state's approval of his disability in November, 2005, 40 percent of which was sent to the plaintiff in recognition of the financial orders stemming from the parties' dissolution.

[8] Hereinafter, all references to the trial court are to *Dyer, J.*, unless otherwise indicated.

that we should not address its merits. The plaintiff asserts that (1) the defendant's motion for clarification is an improper collateral attack on the judgment of dissolution, (2) by failing to appeal from the judgment of dissolution, the defendant has waived any claim that the trial court lacked statutory authority to render that judgment, and (3) the defendant has not provided an adequate record for review. We disagree and conclude that the defendant's appeal is properly before us.[9]

### A

The plaintiff first claims that, because the defendant's motion for clarification is more properly characterized as a motion to open and modify the terms of the judgment of dissolution, it is an untimely collateral attack on that judgment. We disagree.

It is well established that "[t]he court's judgment in an action for dissolution of a marriage is final and binding [on] the parties, where no appeal is taken therefrom, unless and to the extent that statutes, the common law or rules of [practice] permit the setting aside or

---

[9] We note that the plaintiff has not strictly complied with Practice Book § 63-4 (a) (1), which provides in relevant part: "If any appellee wishes to (A) present for review alternate grounds upon which the judgment may be affirmed, [or] (B) present for review adverse rulings or decisions of the court which should be considered on appeal in the event the appellant is awarded a new trial . . . that appellee shall file a preliminary statement of issues within twenty days from the filing of the appellant's preliminary statement of the issues.

"Whenever the failure to identify an issue in a preliminary statement of issues prejudices an opposing party, the court may refuse to consider such issue."

The record does not indicate that the plaintiff filed such a statement with this court with respect to these procedural issues, which are framed as alternate grounds for affirmance. We nonetheless proceed to review these claims because we conclude that the defendant has not been prejudiced by this procedural defect. See, e.g., *DiSesa* v. *Hickey*, 160 Conn. 250, 263, 278 A.2d 785 (1971); cf. Practice Book § 63-4 (a) (1) ("[w]henever the failure to identify an issue in a preliminary statement of issues prejudices an opposing party, the court may refuse to consider such issue").

modification of that judgment. Under Practice Book [§ 17-4], a civil judgment may be opened or set aside . . . [when] a motion seeking to do so is filed within four months from the date of its rendition. . . . Absent waiver, consent or other submission to jurisdiction, however, a court is without jurisdiction to modify or correct a judgment, in other than clerical respects, after the expiration of [that four month period] . . . . After the expiration of the four month period provided by [Practice Book § 17-4] a judgment may not be vacated [on] the sole ground that it is erroneous in matter of law, except by a court exercising appellate or revisory jurisdiction, unless such action is authorized by statute or unless the error is one going to the jurisdiction of the court rendering the judgment." (Citation omitted; internal quotation marks omitted.) *Misinonile* v. *Misinonile*, 190 Conn. 132, 134, 459 A.2d 518 (1983).

Even beyond the four month time frame set forth in Practice Book § 17-4, however, courts have "continuing jurisdiction to fashion a remedy appropriate to the vindication of a prior . . . judgment . . . pursuant to [their] inherent powers . . . ." (Citation omitted; internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, 260 Conn. 232, 239, 796 A.2d 1164 (2002). When an ambiguity in the language of a prior judgment has arisen as a result of postjudgment events, therefore, a trial court may, at any time, exercise its "continuing jurisdiction to effectuate its prior [judgment] . . . by interpreting [the] ambiguous judgment and entering orders to effectuate the judgment as interpreted . . . ." Id., 246. In cases in which execution of the original judgment occurs over a period of years, a motion for clarification is an appropriate procedural vehicle to ensure that the original judgment is properly effectuated. See id., 244 ("[M]otions for interpretation or clarification, although not specifically described in the rules of practice, are

commonly considered by trial courts and are procedurally proper. . . . There is no time restriction imposed on the filing of a motion for clarification."). Motions for clarification may not, however, be used to modify or to alter the substantive terms of a prior judgment; see *In re Haley B.*, 262 Conn. 406, 413, 815 A.2d 113 (2003); see also *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, supra, 250; and "we look to the substance of the relief sought by the motion rather than the form" to determine whether a motion is properly characterized as one seeking a clarification or a modification. *In re Haley B.*, supra, 413.

In the present case, the defendant filed a motion for clarification, asserting that postdissolution events revealed a latent ambiguity in the dissolution judgment as to whether the trial court intended to distribute the defendant's disability benefits in connection with its distribution of the parties' marital property. In effect, the defendant asked the court to clarify that it did not and could not have intended to distribute his disability benefits because they are not marital property distributable under § 46b-81 and, therefore, that the trial court lacked statutory authority to distribute them. In other words, the defendant asserted that there was an ambiguity as to whether the trial court intended the term "monthly retirement benefit" to include his disability benefits, which ambiguity arose from the legal question of whether disability benefits are marital property potentially subject to distribution. The trial court concluded that there was no ambiguity in the judgment of dissolution and that the defendant's disability benefits were distributable under § 46b-81 on the basis of our decision in *Travelers Ins. Co.* v. *Pondi-Salik*, supra, 262 Conn. 746, in which we held, in a different context, that such benefits are properly characterized as retirement benefits, which we generally have considered to be distributable marital property. The defendant contends

that, because the mere classification of disability benefits as retirement benefits does not adequately resolve the issue of whether those benefits are distributable marital property, the trial court's analysis as to whether there was an ambiguity in the judgment of dissolution was incomplete and improper.

We conclude that the defendant's use of a motion for clarification was proper in this case. The defendant did not ask the trial court to revisit its original judgment and effectuate its original intent by, for example, reducing the plaintiff's share of his retirement benefits from 40 percent to 20 percent. Such use of a motion for clarification would properly be characterized as a motion to modify because it would represent an attempt to alter the substantive terms of the original judgment. See, e.g., *In re Haley B.*, supra, 262 Conn. 414 (motion for clarification properly characterized as motion to alter or to modify original judgment when trial court changed, on basis of mistake made at trial, visitation order by reducing frequency of visitation from weekly to monthly visitation in order to effectuate intent of original judgment); *State* v. *Denya*, 107 Conn. App. 800, 812, 946 A.2d 931 (court modified prior judgment when, in guise of clarifying ambiguity, it changed condition of probation requiring electronic monitoring of defendant at discretion of probation officer to requirement of continuous electronic monitoring for duration of defendant's probation), cert. granted, 288 Conn. 906, 953 A.2d 654 (2008); *Miller* v. *Miller*, 16 Conn. App. 412, 416–17, 547 A.2d 922 (trial court modified original judgment by subsequently ordering that any securities transferred to plaintiff in satisfaction of $500,000 lump sum alimony award pay dividends of at least $50,000 per year), cert. denied, 209 Conn. 823, 552 A.2d 430 (1988). In the present case, however, the defendant merely asked the trial court to clarify that it never intended to include his disability benefits, which never

were expressly contemplated by the trial court, in the term "monthly retirement benefit" because they do not constitute marital property, regardless of the characterization of such benefits in *Travelers Ins. Co.* v. *Pondi-Salik*, supra, 262 Conn. 751. Moreover, neither the parties nor the trial court could have contemplated that such benefits would in fact be included in the defendant's retirement benefits because we did not decide *Pondi-Salik* until 2003, approximately two years after the financial orders in the present case were issued. We conclude, therefore, that the defendant's motion for clarification was not an improper attempt to reopen and modify the substantive terms of the judgment of dissolution but, rather, was a proper attempt to clarify an existing ambiguity as to the intent of that judgment.

B

We next address the plaintiff's claim that the defendant, in failing to appeal from the judgment of dissolution, has waived any claim that the trial court lacked statutory authority to distribute his disability benefits. Specifically, the plaintiff contends that, because the defendant had ample opportunity to challenge the trial court's authority to distribute his disability benefits, but did not do so at trial or through a timely appeal or motion to open and modify the original judgment, he cannot now bring his claim several years after the fact. We conclude that the plaintiff's claim is without merit.

The only precedent that the plaintiff cites in support of her claim is *Gagne* v. *Vaccaro*, 80 Conn. App. 436, 446–48, 835 A.2d 491 (2003), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004), in which the Appellate Court concluded that the defendant in that case had waived his claim, raised for the first time on appeal, that the unjust enrichment count of the plaintiff's complaint was improperly tried to a jury, when the defendant himself had claimed the matter to the jury in the first place. The

court's decision in *Gagne*, however, is distinguishable from the present case. In *Gagne*, the Appellate Court stated that "[w]aiver is an intentional relinquishment or abandonment of a known right or privilege. . . . It involves the idea of assent, and assent is an act of understanding. . . . The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct. . . . In order to waive a claim of law it is not necessary . . . that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence of the claim and of its reasonably possible efficacy." (Citations omitted; internal quotation marks omitted.) Id., 445–46. Accordingly, the Appellate Court recognized that the defendant, in claiming the matter to the jury, had assented to such an action and had intended such a result. Moreover, he repeatedly had failed to raise any objection throughout the proceedings that a jury trial on that particular claim was improper, despite his undeniable knowledge and intent that that claim be so tried. Id., 446–47.

In the present case, however, all of the parties involved at trial were entirely unaware that the trial court's original judgment could possibly contemplate the distribution of the defendant's disability benefits, particularly in view of the fact that *Pondi-Salik* had not yet been decided when the trial court rendered the dissolution judgment. Indeed, in denying the plaintiff's motion to dismiss the defendant's motion for clarification, the trial court, *Solomon, J.*, stated: "I've never had the request made of me in six years on the bench as a family judge. I've never had anybody address, as part of the pension distribution, what happens in a disability situation, either before or after a trial or as part of an agreement," and that, "as part of the dissolution process itself, either by way of agreement or by way of a trial . . . I don't recall an instance where . . . the issue of

what happened in the event of disability was ever raised." Thus, in our view, there is insufficient justification to warrant the conclusion that either the parties or the trial court was aware of the potential issue of disability benefits being included in the financial orders, or that the defendant had a chance to litigate that particular issue at trial.[10] Moreover, the defendant filed his motion for clarification within three months of learning that his disability benefits were being apportioned to the plaintiff in conformance with the trial court's financial orders. Accordingly, we conclude that the plaintiff's claim is without merit.

## C

Finally, we address the plaintiff's claim that the defendant has not provided this court with an adequate record for review of his appellate claims. The plaintiff contends that the defendant has not provided this court with the necessary materials to review his claims because the defendant did not seek an articulation of the judgment of dissolution and has not provided any transcripts from the original trial. We disagree and conclude that the record is adequate for review.

"It is well established that [i]t is the appellant's burden to provide an adequate record for review. . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record [when] the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter."

---

[10] The plaintiff asserts that the fact that the trial court specifically distributed the defendant's potential hazardous duty retirement benefits indicates that the parties were aware that the defendant was engaged in a hazardous occupation and, therefore, that they should have known that the defendant could potentially become disabled in the future. In our view, however, the mere knowledge that the defendant was engaged in employment that entailed a remote chance of disability was insufficient justification to conclude that the parties should have anticipated the specific legal issues in this case.

(Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232, 828 A.2d 64 (2003).

The plaintiff does not claim that the defendant has failed to provide an adequate record of the trial court's disposition of the defendant's motion for clarification, or that the trial court's stated basis for its decision was so inadequate as to deprive this court of any meaningful opportunity for review. Indeed, the defendant has provided a full record of that particular decision, including transcripts, memoranda and the trial court's detailed memorandum of decision, which contains its legal reasoning. Rather, the plaintiff bases her claim on the fact that the defendant has not provided this court with transcripts from the proceedings leading up to, or an articulation of, the judgment of dissolution. That the defendant has not provided this court with those materials does not impede our review of this appeal, however, because the defendant does not challenge the rationale supporting the court's decision made in connection with the dissolution judgment. The sole focus of the defendant's appeal is that the trial court improperly denied his motion for clarification on the basis of its legal conclusion that disability benefits acquired after the dissolution constitute marital property distributable under § 46b-81. We do not see how the transcripts of the proceedings leading up to the judgment of dissolution, in which the issue regarding the distribution of the defendant's disability benefits was not even contemplated, could be helpful to our review of the defendant's claims. We conclude, therefore, that the defendant has provided this court with an adequate record for review and that this appeal is properly before this court.

II

A

We turn now to the merits of the defendant's appeal. The defendant first claims that the trial court improp-

erly relied on our decision in *Travelers Ins. Co.* v. *Pondi-Salik,* supra, 262 Conn. 746, to conclude that there was no ambiguity in the judgment of dissolution, and that the defendant's disability benefits were properly distributed pursuant to that judgment. Specifically, the defendant contends that *Pondi-Salik* is inapplicable because the issue of whether disability benefits are properly labeled as retirement benefits is immaterial to the determination of whether those benefits are distributable as marital property under § 46b-81. We agree with the defendant that our characterization in *Pondi-Salik* of disability benefits awarded under § 5-192p as retirement benefits is not dispositive of this appeal.

In *Pondi-Salik,* we addressed the issue of whether, in the context of an automobile insurance coverage dispute, disability benefits paid pursuant to § 5-192p are properly characterized as disability benefits or retirement benefits. Id., 747–48. After engaging in an extensive analysis of the language and legislative history of § 5-192p, the broader statutory scheme in which § 5-192p exists and the existence of a separate and parallel statutory scheme for the provision of pure disability benefits for state employees, we concluded that disability benefits under § 5-192p are "in the nature of retirement benefits and not disability benefits"; id., 755; and that "[d]isability operates only to accelerate the employee's qualification for retirement benefits under § 5-192p." Id.

Although the disability retirement benefit statute at issue in *Pondi-Salik* is the same as that in the present case, we conclude that the significant factual and procedural differences between the two cases render *Pondi-Salik* inapposite. In particular, although we previously have concluded that general retirement benefits are distributable under § 46b-81; see, e.g., *Krafick* v. *Krafick,* 234 Conn. 783, 798, 663 A.2d 365 (1995); we never have addressed the particular issue that is presented in

this case, namely, whether that portion of a defendant's retirement benefits that is specifically attributable to a postdissolution disability is properly considered marital property under § 46b-81. The determination of that issue requires an entirely different analysis than that which we applied in *Pondi-Salik*. See part II B of this opinion. In *Pondi-Salik*, we examined § 5-192p to determine whether payments made under that statute could be characterized as a "disability benefit" under an insurance policy between the parties that reduced the amount payable to the defendant by "[a]ll sums paid or payable under any workers' compensation, disability benefits or similar law . . . ." (Internal quotation marks omitted.) *Travelers Ins. Co.* v. *Pondi-Salik*, supra, 262 Conn. 753. Although we determined that "[the] benefits paid pursuant to § 5-192p are in the nature of retirement benefits and not disability benefits"; id., 755; we did not analyze these benefits to determine whether this conclusion was appropriate in the context of an equitable property division in a marital dissolution proceeding. Furthermore, unlike in the present case, in *Pondi-Salik*, this court was examining the nature of the benefits at a point in time when the existence, nature and extent of the disability already were known. Thus, there was no discussion of the speculative nature of such benefits, or how they should be characterized before a disability actually occurs in light of the policy considerations underlying our equitable distribution statute. Consequently, we agree with the defendant that *Pondi-Salik* is not dispositive of this appeal.

B

Accordingly, we now address the defendant's principal claim on appeal, namely, that his disability benefits do not constitute distributable marital property and, therefore, that the trial court lacked authority to distribute those benefits under § 46b-81. Specifically, the defendant contends that his receipt of disability benefits

was too speculative at the time of dissolution to render his interest in those benefits a property interest under § 46b-81. Even if the disability benefits did constitute property, however, the defendant asserts that they were nevertheless not *marital* property because they (1) were not actually acquired until after the judgment of dissolution was rendered, and (2) represent compensation for lost wages attributable to services that would have been performed postdissolution. We conclude that the defendant's disability benefits did not constitute property subject to distribution within the meaning of § 46b-81 at the time of dissolution under the controlling two part test set forth in *Bender* v. *Bender*, 258 Conn. 733, 748–49, 785 A.2d 197 (2001).

We begin our analysis by determining the appropriate standard of review. We are called on in this case to interpret § 46b-81 to determine whether the defendant's disability benefits are property eligible for distribution pursuant to that statute.[11] The question of whether disability benefits received postdissolution constitute marital property distributable under § 46b-81 raises a question of statutory interpretation over which we exercise plenary review. See, e.g., *Dept. of Transportation* v. *White Oak Corp.*, 287 Conn. 1, 7, 946 A.2d 1219 (2008).

"The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs

---

[11] This task requires that we also interpret General Statutes §§ 46b-82, 5-192*l* and 5-192p in order to determine the nature of the benefits in dispute and how they should be characterized.

us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Friezo* v. *Friezo*, 281 Conn. 166, 181–82, 914 A.2d 533 (2007).

With respect to § 46b-81, we previously have determined that the purpose of postdissolution "property division is to unscramble the ownership of property, giving to each spouse what is equitably his." (Internal quotation marks omitted.) *Rubin* v. *Rubin*, 204 Conn. 224, 228, 527 A.2d 1184 (1987). While undertaking this task, we have considered the nature of the marital relationship: "[M]arriage is, among other things, a shared enterprise or joint undertaking in the nature of a partnership to which both spouses contribute—directly and indirectly, financially and nonfinancially—*the fruits of which* are distributable at divorce." (Emphasis in original; internal quotation marks omitted.) *Krafick* v. *Krafick*, supra, 234 Conn. 795. To this end, we generally have taken a liberal view of the term "property," while declaring that "the theme running through this area of our jurisprudence . . . pays mindful consideration to the equitable purpose of our statutory distribution scheme, rather than to mechanically applied rules of property law. In order to achieve justice, equity looks to substance, and not to mere form." *Bender* v. *Bender*, supra, 258 Conn. 751.

Placing each spouse in an equitable postdissolution position, however, requires a court to consider more than merely how to divide the marital property. Through General Statutes § 46b-82,[12] the legislature has empowered courts to create in either or both spouses an obligation to provide future financial support to the other through continuing alimony payments. We also must examine this companion statute, therefore, in order to understand more completely the interrelationship between §§ 46b-81 and 46b-82. These two statutes, working together, provide the courts of this state with their primary tools for apportioning the property and income of spouses when a marriage dissolves. Indeed, General Statutes § 46b-82 (a) provides in relevant part: "At the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other, *in addition to or in lieu of* an award pursuant to section 46b-81. . . ." (Emphasis added.) Despite their close relationship, however, the purposes and operation of §§ 46b-81 and 46b-82 are distinct and, to an extent, complementary, applying under different circumstances for different reasons. Although the purpose of § 46b-81 is to "unscramble" the spouses' *current* property interests; (internal quotation marks omitted) *Rubin* v. *Rubin,* supra, 204 Conn. 228; the purpose of § 46b-82 is to recognize "the obligation of support that spouses assume toward each other by virtue of the

[12] General Statutes § 46b-82 provides in relevant part: "(a) At the time of entering the [divorce] decree, the Superior Court may order either of the parties to pay alimony to the other, in addition to or in lieu of an award pursuant to section 46b-81. . . . In determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b-81, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability of such parent's securing employment. . . ."

marriage." Id., 234; see also *Smith* v. *Smith*, 249 Conn. 265, 275, 752 A.2d 1023 (1999) ("the purpose of both periodic and lump sum alimony is to provide continuing support"). Thus, using both statutes, a court can consider the individual circumstances of each marriage to fashion a fair distribution of *presently* existing marital property as well as ensuring the *future* support of a dependent spouse.

Under § 46b-81, a court has the authority to divide only the *presently* existing property interests of the parties at the time of dissolution, and such division, once made, cannot be altered. See *Smith* v. *Smith*, supra, 249 Conn. 275 ("once the marital property is divided, the court has fulfilled its responsibility, and, therefore, continuing jurisdiction over divided marital property does not further the goal of the statutes"). An alimony award made at the time of dissolution, on the other hand, *can* be subsequently modified at any time to account for any significant changes in the circumstances of the parties. General Statutes § 46b-86 (a) provides in relevant part that an alimony award can "be continued, set aside, altered or modified by [the] court upon a showing of a substantial change in the circumstances of either party . . . ." The relevant circumstances for a court to consider in establishing or modifying an alimony award are set forth in General Statutes § 46b-82 (a), which provides in relevant part that, "[i]n determining whether alimony shall be awarded, and the duration and amount of the award, the court . . . shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties . . . ." Thus, §§ 46b-81 and 46b-82 are complementary in that they ensure that courts will consider all of the relevant circumstances in distributing property and

establishing future support obligations. In the event that these circumstances change substantially, for example, if one of the spouses receives a substantial inheritance; *Bartlett* v. *Bartlett*, 220 Conn. 372, 383, 599 A.2d 14 (1991); or becomes unemployed; see *Simms* v. *Simms*, 283 Conn. 494, 504, 927 A.2d 894 (2007); § 46b-86 provides courts with flexibility to modify an alimony award to reflect these unexpected or uncertain events.

In order to address fully the defendant's claim that his disability benefits are not subject to equitable distribution, it also is important to understand the nature of the disability and retirement plan under which those benefits were granted. General Statutes §§ 5-192e through 5-192x define the state employee tier II retirement plan of which the defendant was a member. The plan is a noncontributory,[13] comprehensive scheme including provisions for normal retirement; see General Statutes § 5-192*l*; hazardous duty retirement; see General Statutes § 5-192n; and disability retirement. See General Statutes § 5-192p. An employee's eligibility and amount of benefits under the normal retirement plan are based on (1) years of state employment, which are defined as "vesting service"; General Statutes § 5-192i (a); and (2) various qualified periods of nonstate employment, which together with years of state employment are defined as "credited service . . . ." General Statutes § 5-192j (a). An employee may retire voluntarily with a retirement benefit upon reaching a certain age with a defined number of years of accrued vesting service.[14] See generally General Statutes § 5-192*l*. Upon

_____

[13] Although § 5-192u declares that tier II plan members need not contribute to the plan to receive their retirement benefits, the record reflects that the defendant had contributed $19,193.53 as of the date of dissolution. It is not necessary for us to resolve this discrepancy to resolve the issues presented by this case.

[14] We note that, as a hazardous duty member, the defendant also was eligible to apply for hazardous duty retirement under § 5-192n after completing twenty-five years of credited service. Section 5-192n contains its own formula for calculating hazardous duty retirement benefits, which are not relevant in the present case.

retiring under the normal retirement plan, the eligible employee's actual benefit is computed using formulas that primarily account for the employee's amount of credited service and his average annual earnings. See General Statutes § 5-192*l* (c).

The disability retirement plan is distinct from, and complementary to, the normal retirement plan. If an employee under this plan is disabled prior to applying for retirement, the formula remains the same, except that § 5-192p (c) provides the employee the benefit of an additional number of years of credited service that "he would have at age sixty-five if he continued to work until that age, but limited to a maximum of thirty years," unless his actual credited service as of his disability retirement date is greater, in which case the formula works exactly the same as in normal retirement. In this way, the acceleration clause of § 5-192p (c) serves to reimburse a disabled employee for those years of compensation forgone due to disability, whereas the amount determined under § 5-192*l* on the basis of the employee's actual years of credited service operates as a standard pension benefit, representing deferred compensation for those years of service actually completed.

With this background of the relevant statutes in mind, we now turn to a more specific examination of the meaning of the term "property" in § 46b-81. The legislature has not seen fit to define this critical term, leaving it to the courts to determine its meaning through application on a case-by-case basis. "Neither § 46b-81 nor any other closely related statute defines property or identifies the types of property interests that are subject to equitable distribution in dissolution proceedings." (Internal quotation marks omitted.) *Bender* v. *Bender*, supra, 258 Conn. 742. As we noted previously, this court has generally taken a rather "broad and comprehensive" view of the meaning of the term "property" for purposes of equitable distribution. *Krafick* v. *Krafick*, supra, 234

Conn. 795. We have not erased altogether, however, the limitations inherent in the term. We continue to recognize that "the marital estate divisible pursuant to § 46b-81 refers to interests already acquired, not to expected or unvested interests, or to interests that the court has not quantified." *Smith* v. *Smith*, supra, 249 Conn. 274; see also *Simmons* v. *Simmons*, 244 Conn. 158, 165, 708 A.2d 949 (1998) ("[§] 46b-81 applies only to presently existing property interests, not mere expectancies" [internal quotation marks omitted]); *Rubin* v. *Rubin*, supra, 204 Conn. 230–31 ("[p]roperty entails interests that a person has *already acquired* in *specific* benefits" [emphasis added; internal quotation marks omitted]). Our cases thus have generally divided the various contested property interests under § 46b-81 by characterizing them as either "presently existing" and enforceable and, therefore, distributable; *Simmons* v. *Simmons*, supra, 165; or mere expectancies immune from equitable distribution. Id.

For instance, in *Krafick*, we addressed the issue of whether a vested[15] but unmatured pension could be

---

[15] Black's Law Dictionary defines "vested" as "[h]aving become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute . . . ." Black's Law Dictionary (8th Ed. 2004); see also *Taylor* v. *Taylor*, 57 Conn. App. 528, 533, 752 A.2d 1113 (2000) ("The fact that a right is contingent on a future event does not mean that the right is only an expectancy. A vested right can be contingent on a future event, such as continued employment or death."). The most important aspect of vesting in the context of pensions is that it immunizes the employee's interest from being unilaterally altered or abolished by the employer. For instance, in the context of statutory pensions, an employee who has a vested pension would be unaffected by legislative changes to the pension plan occurring *after* he has obtained a vested interest in a particular benefit. See *Pineman* v. *Oechslin*, 195 Conn. 405, 416, 488 A.2d 803 (1985) (state employees "have statutory rights to retirement benefits once they satisfy the eligibility requirements of the [State Employees Retirement Act] by becoming eligible to receive benefits").

A vested interest "matures" when the holder of that interest obtains a right to *present* possession or payment without further precondition. See *In re Marriage of Brown*, 15 Cal. 3d 838, 842, 544 P.2d 561, 126 Cal. Rptr. 633 (1976) ("We shall use the term 'vested' . . . as defining a pension right

classified as marital property subject to equitable distribution pursuant to § 46b-81. See *Krafick* v. *Krafick*, supra, 234 Conn. 797–98. The plaintiff in *Krafick* was contesting the trial court's refusal to consider the defendant's pension benefits alongside other assets in distributing the marital estate. Id., 791–92. The defendant's pension vested at twenty years of service, and the benefit, calculated pursuant to a formula based on the employee's total years of service and an average of the employee's three highest years of earnings, was payable, or matured, upon retirement. Id., 788–89. At the time of the trial, the defendant in *Krafick* was eligible to retire and represented that he intended to do so in approximately two years. Id., 789.

Analyzing the plaintiff's claim, we first described the nature of the interest in dispute: "Pension benefits represent a form of deferred compensation for services rendered. . . . [T]he employee receives a lesser present compensation plus the contractual right to the future benefits payable under the pension plan." (Citations omitted; internal quotation marks omitted.) Id., 794–95. We then proceeded to place pension benefits in the broader context of the goals of postdissolution equitable property distribution: "[T]he primary aim of property distribution is to recognize that marriage is, among other things, a shared enterprise or joint undertaking in the nature of a partnership to which both spouses contribute—directly and indirectly, financially and nonfinancially—*the fruits of which* are distributable at divorce." (Emphasis in original; internal quotation

which survives the discharge or voluntary termination of the employee. As so defined, a vested pension right must be distinguished from a 'matured' or unconditional right to immediate payment."); see also *Bender* v. *Bender*, supra, 258 Conn. 746 ("[w]e distinguished the medical degree in *Simmons* [v. *Simmons*, supra, 244 Conn. 158] from the vested, unmatured pension benefits at issue in *Krafick* [v. *Krafick*, supra, 234 Conn. 783], reasoning that the medical degree did not involve a presently existing, enforceable right to receive income in the future").

marks omitted.) Id., 795. We concluded that vested pension benefits are "an economic resource acquired with the fruits of the wage earner spouse's labors which would otherwise have been utilized by the parties during the marriage to purchase other deferred income assets"; (internal quotation marks omitted) id., 796; and, thus, distributable as marital property. Id., 796–97.

We next had to determine whether treating the defendant's vested, but unmatured, pension as property under § 46b-81 violated our understanding of the limitations of the reach of the statute. See id., 797. Recognizing that § 46b-81 "applies only to presently existing property interests, [and] not mere expectancies"; (internal quotation marks omitted) id.; we concluded that *vested* pension benefits are appropriately characterized as a presently existing property interest because they "represent an employee's right to receive payment in the future, subject ordinarily to his or her living until the age of retirement." Id.

Our decision in *Krafick* was followed by several cases expounding on the foundation laid in that opinion. For example, in *Bornemann* v. *Bornemann*, 245 Conn. 508, 515, 752 A.2d 978 (1998), we confronted the issue of whether "stock options that have been granted but have not yet become exercisable at the time of a dissolution and can be exercised at a future date only if certain conditions are met by the employee to whom they were granted are a property interest encompassed within the meaning of property under § 46b-81."[16] Analogizing those stock options to the vested pension benefits in

---

[16] We note the general impreciseness with which critical terms have been employed in some of our opinions in this area. In *Bornemann*, for instance, we used the terms "matured" and "vested" as if they are synonymous. (Internal quotation marks omitted.) *Bornemann* v. *Bornemann*, supra, 245 Conn. 517. As we noted in footnote 15 of this opinion, however, these terms have very different meanings, and their conflation reveals a fundamental confusion in this court's jurisprudence.

*Krafick*, we concluded that a contractual interest in stock options that were granted but had not yet become exercisable was "property" subject to distribution because "the options created an enforceable right in the defendant." Id., 518. In reaching this conclusion, we found it significant that the options would mature as long as the defendant abided by the terms of his contractual arrangement with his former employer.[17] Id. In the absence of any breach of the agreement, the defendant "was entitled to exercise the options on their respective maturity dates, and would have had a cause of action for breach of contract if [his former employer] had refused to allow him to exercise the options. Such a presently existing, contractual interest is an interest in property that is encompassed within the broad definition of property under § 46b-81." Id.[18] Significantly, the defendant in *Bornemann* had a contractual interest in

---

[17] The stock options were granted as part of a termination agreement between the defendant and his former employer. *Bornemann* v. *Bornemann*, supra, 245 Conn. 512–13. In exchange for agreeing not to compete with or assert any claims against his employer, or reveal any of its trade secrets, the defendant was granted several "flights" of stock options with various maturity dates. Id., 513.

[18] The fear that we expressed in *Bornemann*, namely, that "fail[ing] to interpret property broadly under § 46b-81 could, and likely would, result in substantial inequity in light of the numerous and varied forms of employment compensation that are in use today"; *Bornemann* v. *Bornemann*, supra, 245 Conn. 520; is, in our view, misplaced. General Statutes § 46b-81 (c) affords the trial court substantial discretion to consider almost any factor in "fixing the nature and value of the property, if any, to be assigned," including the "occupation, amount and sources of income . . . employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income." This language allows courts to account for nontraditional forms of compensation and assets in developing an equitable distribution plan without distorting the meaning of property to achieve the same result. Moreover, as we explain subsequently in this opinion, the expanded view of property that this court established in *Bender* v. *Bender*, supra, 258 Conn. 753, effectively eliminates the potential for the inequity that we described in *Bornemann*.

the stock options that could not be unilaterally modified or terminated by the employer.[19]

There also is a line of cases, at the other end of the spectrum, recognizing that the definition of property interests subject to distribution under § 46b-81, although broad, is not without limits. For instance, in *Simmons* v. *Simmons*, supra, 244 Conn. 164, we concluded that a spouse's medical degree is not property within the meaning of § 46b-81. In so holding, we distinguished "presently existing property interest[s]," which are subject to distribution, from "mere expectanc[ies]," which are immune from such treatment; id., 165; and declared that "the defining characteristic of property for purposes of § 46b-81 is the present existence of the right and the ability to enforce that right." Id., 166. We have characterized interests as "mere expectancies" in several other contexts as well. See, e.g., *Smith* v. *Smith*, supra, 249 Conn. 274 (plaintiff's interest in family trust expectancy not subject to distribution because "the marital estate divisible pursuant to § 46b-81 refers to interests already acquired, not to expected or unvested interests"); *Eslami* v. *Eslami*, 218 Conn. 801, 807–808,

---

[19] We believe that the concurring and dissenting justice's understanding of *Bornemann* is deficient and that his reliance on that case is misplaced. Our decision in *Bornemann* was explicitly founded on the fact that the defendant in that case had an enforceable contractual right to the stock options at issue. We specifically described the nature of the interest and its consequences: "[T]he holder of a stock option possesses the right to accept, under certain conditions and within a prescribed time period, the employer's offer to sell its stock at a predetermined price. . . . Should the employer attempt to withdraw the offer, the employee has a 'chose in action' in contract against the employer. . . . Conversely, '[t]he defining characteristic of an expectancy is that its holder has no enforceable right to his beneficence.'" (Citations omitted.) *Bornemann* v. *Bornemann*, supra, 245 Conn. 517. In the present case, we conclude that the defendant's *interest* in his disability benefits at the time of dissolution is readily distinguishable from the enforceable contract right in *Bornemann* because the legislature was under no obligation to maintain the benefits prior to the defendant's injury, and the defendant would have had no cause of action against the state if the legislature had decided to terminate the disability program.

591 A.2d 411 (1991) (interest in contested inheritance not distributable but may be addressed under § 46b-86 when value ascertained and parties' financial circumstances determined); *Rubin* v. *Rubin*, supra, 204 Conn. 230–32 (contingent award of expected inheritance not distributable under § 46b-81); *Krause* v. *Krause*, 174 Conn. 361, 365, 387 A.2d 548 (1978) (interest in future inheritance too speculative to constitute property under predecessor to § 46b-81).[20]

---

[20] We disagree with the concurring and dissenting justice's characterization of this court's opinion in *Smith* v. *Smith*, supra, 249 Conn. 265. Discussing *Smith*, the concurring and dissenting opinion declares: "We concluded [in *Smith*] that, even though the [defendant's settlement] award could not have been received unless and until the pending civil action was successfully resolved in the defendant's favor, the interest in that potential award was marital property at the time that the parties agreed to distribute their property because the defendant had an enforceable right to receive the award in the event that the action *was* successful." (Emphasis in original.) Rather, we stated in *Smith* that "[t]he trial court . . . reasonably found that the defendant's *claim* against [her employer] was an *inchoate marital asset* [at the time of dissolution] because, through her work [for her employer], the defendant had already earned an enforceable right to the compensation. Consequently, the trial court properly divided the net settlement proceeds between the parties pursuant to § 46b-81 when it dissolved the parties' marriage." (Emphasis added.) *Smith* v. *Smith*, supra, 286. Thus, we were merely endorsing the trial court's finding that the defendant had obtained a *chose in action* during the course of the marriage, which is clearly a property interest subject to distribution. See *Dolak* v. *Sullivan*, 145 Conn. 497, 504, 144 A.2d 312 (1958) ("chose in action" is "intangible personal property"); *Siller* v. *Siller*, 112 Conn. 145, 150, 151 A. 524 (1930) ("[t]here is no doubt that a right in action, [when] it comes into existence under common-law principles, and is not given by statute as a mere penalty or without equitable basis, is as much property as any tangible possession"); see also *Lopiano* v. *Lopiano*, 247 Conn. 356, 370, 752 A.2d 1000 (1998) (right of action characterized as property under § 46b-81). The *value* of the chose in action, on the other hand, determined at least in part by the party's chances of prevailing, may be unknown, and, indeed, the action may turn out to be worthless. Nevertheless, that fact is irrelevant to its classification as a property interest. See, e.g., *Bender* v. *Bender*, supra, 258 Conn. 749–50 (classification stage distinct from valuation stage in analyzing potential interests for equitable distribution). In the present case, the defendant was not injured until well after the marriage was dissolved. Thus, not only did he not have an enforceable contractual or statutory interest in potential disability benefits at the time of dissolution, but he also lacked a cause of

Our decision in *Bender* v. *Bender*, supra 258 Conn. 733, updated this traditional, fairly rigid dichotomy by establishing a more nuanced approach to defining property interests under § 46b-81. In *Bender*, this court "built [on the] foundation" of our prior cases in concluding that the unvested pension of the defendant in that case was property subject to equitable distribution. Id., 753–54. Consistent with our time-honored approach, we reiterated that presently enforceable rights, based on either property or contract principles, are *sufficient* to cause property to be divisible. Where *Bender* broke new ground was in its recognition that such rights are not the "sine qua non of 'property' under § 46b-81." Id., 753. In building on our prior cases, we expanded our notion of property under § 46b-81, recognizing that there is a spectrum of interests that do not fit comfortably into our traditional scheme and yet should be available in equity for courts to distribute.

If the acquisition of such an "unconventional" interest is contingent on a future event or circumstance, we now examine the contingency to determine if it is overly speculative. See id., 748–50. Thus, *Bender* created a two step framework that preserved the traditional definition of property while carving out a middle ground, encompassing some inchoate property interests that would have been excluded from the definition of distributable property under the older regime. These interests may now be considered on the basis of the likelihood that a contingency eventually would come to pass. Of course, in order to apply this analytical framework properly, it is critical to categorize the type of contingency being addressed. A contingency on which the mere *enjoyment* of a property interest depends differs from a contingency on which acquisition of the property interest *itself* hinges. The former—e.g., a vested but

---

action regarding such benefits that could be classified as an intangible property interest subject to distribution under § 46b-81.

unmatured pension or an inchoate contractual right—would simply be classified as distributable property under the first step of the *Bender* analysis, whereas the latter would fail the classic test and therefore have to be addressed under *Bender*'s second step.[21] See *Simmons* v. *Simmons*, supra, 244 Conn. 167–68.

In *Bender*, we determined that the defendant's unvested pension benefits, although dependent on cer-

---

[21] Herein lies the crux of our disagreement with the concurring and dissenting opinion. In our view, the concurring and dissenting justice misunderstands the nature of the contingencies involved in the present case and mistakenly characterizes the defendant's disability benefit as a "vested" interest merely awaiting a qualifying injury to become a matured interest. In this case, the contingency, i.e., the disabling injury, *is* the vesting event. In other words, prior to becoming disabled, the defendant possessed nothing more than an *expectancy* that, should he be injured in the course of his employment, he would receive a disability benefit if the statute remained unchanged. See *Simmons* v. *Simmons*, supra, 244 Conn. 166 ("[U]nlike a property interest, an expectancy may never be realized . . . . The term expectancy describes the interest of a person who merely foresees that he might receive a future beneficence. . . . [T]he defining characteristic of an expectancy is that its holder has no enforceable right to his beneficence." [Internal quotation marks omitted.]). What the defendant in the present case did not have, however, was a legally enforceable interest in the event that the legislature decided to modify or terminate this benefit prior to the occurrence of such an injury. For instance, unlike the defendant's contractual interest in granted but unmatured stock options that we recognized in *Bornemann* v. *Bornemann*, supra, 245 Conn. 518, the defendant in the present case would have no remedy for what could best be described in contract law parlance as an anticipatory breach by the legislature. Indeed, its analysis of the statutory language notwithstanding, the concurring and dissenting justice appears to recognize, perhaps inadvertently, the unvested nature of the disability benefit at issue when the concurring and dissenting opinion declares that, "although neither § 5-192p nor § 5-192*l* explicitly references the legislature's ability to revoke the respective interest, both statutes specify a required period of vesting service before the employee becomes eligible to enforce his interest in the particular benefit once all of the prescribed conditions are satisfied, namely . . . either a ten year vesting period with respect to disability benefits for an injury sustained outside the scope of employment . . . or, alternatively, *immediate vesting* for injuries suffered while on the job." (Emphasis added.) We agree. Immediately upon incurring an injury on the job, an employee subject to § 5-192p obtains a vested interest in the prescribed disability benefits. Prior to such an occurrence, however, we simply cannot perceive under what principle of law the

tain contingencies, were sufficiently certain to constitute divisible property because "these contingencies are susceptible to reasonably accurate quantification." *Bender* v. *Bender,* supra, 258 Conn. 744. In so concluding, we recognized that the various contingencies that may determine future property interests come in different degrees. See id., 754. Distinguishing the unvested pension benefits at issue in *Bender* from the inheritance interests in *Rubin* v. *Rubin,* supra, 204 Conn. 224, and *Krause* v. *Krause,* supra, 174 Conn. 361, we declared that "[u]nvested pension benefits . . . although dependent on certain future contingencies such as length of service and age [i.e., the mere passage of time], are simply not in [the] same *speculative category* [as a potential inheritance]. Moreover, unlike a potential

defendant in this case had an irrevocable, presently existing and enforceable interest in any statutory disability benefit.

We are similarly unpersuaded by the declaration in the concurring and dissenting opinion that "the language of § 5-192p indicates that the defendant's interest had in fact vested as of the first day of his employment with the state, and could not have been revoked by the legislature at any time thereafter." In the absence of statutory language expressly depriving the legislature of its authority to revoke or modify the subject benefits prior to their becoming vested, we are unwilling to import such a limitation by legislative fiat. See, e.g., *Pineman* v. *Oechslin,* 195 Conn. 405, 415, 488 A.2d 803 (1985) ("When the legislature intends to surrender its power of amendment and revision by creating a contract and thereby binding future legislatures, it must declare that intention in clear and unambiguous terms. A relinquishment of this authority should not occur by legislative inadvertence or judicial implication.") General Statutes § 5-192p (a) provides in relevant part: "If a member of tier II, while in state service, becomes . . . disabled as a result of any injury received while in the performance of his duty as a state employee, he is eligible for disability retirement, regardless of his period of state service or his age. . . ." In our view, this language is a clear expression of the legislature's desire to provide benefits for particular state employees in the event that they become disabled in the line of duty. There is no indication, explicit or otherwise, that the legislature intended by this language to bestow an irrevocable contractual right to such benefits on every state employee covered under § 5-192p "as of the first day of his employment," as the concurring and dissenting opinion suggests. We decline to bind the legislature to such an onerous obligation under these circumstances.

inheritance, pension benefits represent a trade-off for potentially higher wages not earned during the marriage; they often represent . . . the only or principal material asset; and they are treated by employers and employees as property in the workplace."[22] (Emphasis added.) *Bender* v. *Bender*, supra, 754.

We conclude that *Bender* stands for the proposition that, even in the absence of a presently enforceable right to property based on contractual principles or a statutory entitlement, a party's expectant interest in property still may fall under § 46b-81 if the conditions precedent to the eventual acquisition of such a definitive right are not too speculative or unlikely. The following statement makes this point apparent: "[I]t is, of course, theoretically possible that the defendant's pension will not vest . . . [for various reasons]. We conclude, however, that the defendant's *expectation* in his pension plan, as a practical matter, is sufficiently *concrete, reasonable* and *justifiable* as to constitute a presently existing property interest for equitable distribution purposes." (Emphasis added.) Id., 749.

We turn finally to an application of the *Bender* analysis to the facts of the present case. First, it is clear that, whatever interest the defendant had in potential disability payments under § 5-192p, that interest was not, at the time of dissolution, a presently existing, enforceable right to a future benefit. Although the defendant may have had an abstract statutory entitlement, in the event that he became disabled, to certain

---

[22] We note that, in our view, employers and employees generally recognize the difference between vested and unvested pensions, and, although they may treat *vested* pensions as property in the workplace, they realize that unvested pensions are worthless beyond any amount that the employee actually has contributed to the plan. Indeed, common experience would indicate that employees consider the date that their pensions vest as a pivotal point in their careers because they understand that it is not until that moment that they have any valuable, enforceable *right* to future pension benefits.

defined benefits, he had no concrete, enforceable right to those benefits unless and until an unfortunate accident befell him. Furthermore, the legislature could have modified or terminated the disability retirement program at any time before the defendant suffered a disability. See *Simmons* v. *Simmons*, supra, 244 Conn. 166. Thus, unlike an interest in a vested pension or a granted but not yet matured stock option, the defendant's interest in his disability benefits was not enforceable prior to the occurrence of the disability.[23] Presumably, the defendant actively was trying to avoid the occurrence of an event triggering an enforceable interest in his disability benefits. We can discern no distinction, for example, between the defendant's interest in his disability benefits and an employee's interest in a potential future workers' compensation claim. To consider these "interests" property in the sense that they could be construed as *presently existing, enforceable* rights to some future asset or income stream is simply to stretch the meaning of these words beyond the breaking point.

Our analysis cannot end here, however, as *Bender* instructs that a presently existing, enforceable right to property, although *sufficient* for purposes of § 46b-81, is not *necessary.* As we noted previously, in light of *Bender*, analyzing an interest that does not become a "right," much less actual, possessory property, prior to the occurrence of some future event or events involves a second step. We must look at the nature of the contingency to determine whether it is so speculative as to be deemed a mere expectancy or, conversely, whether it is "sufficiently concrete, reasonable and justifiable as to constitute a presently existing property interest for equitable distribution purposes." *Bender* v. *Bender,* supra, 258 Conn. 749. This approach recognizes the equitable nature of a property distribution made pursu-

---

[23] This is not to say that private disability plans guaranteed by contract or supported by monetary contributions would not qualify as such an interest.

ant to § 46b-81 and allows courts a measure of flexibility to avoid a patently unfair result. For example, as in *Bender*, this approach allows a court to avoid the inequity that would occur if the marriage dissolves shortly before one of the spouse's pensions vests, especially when the pension is the primary marital asset.[24]

In the present case, the defendant's receipt of disability benefits under § 5-192p was contingent on his becoming sufficiently disabled prior to sixty-five years of age or completing twenty-five years of credited service.[25] A potential disability is, by its very nature, an accidental event that every employee and employer strives to avoid. It is difficult to perceive how a property interest tied to such an occurrence is "sufficiently concrete, reasonable and justifiable"; id.; to treat any benefits that *might* accrue, *if* the accident eventually occurs *and* is serious enough to cause permanent disability, as a presently existing property interest eligible for equitable distribution at the time of dissolution. We are persuaded that this eventuality is more speculative and far less predictable than the income expected to flow from a medical degree; see *Simmons* v. *Simmons*, supra, 244 Conn. 166–70; or the property expected to be acquired through a bequest. See, e.g., *Krause* v. *Krause*, supra 174 Conn. 365. As with a testamentary bequest, however, the disability benefits at issue in the present case were terminable at the state's discretion at any

---

[24] Of course, a court presented with such a scenario also has the option of considering these circumstances in fashioning an alimony award under § 46b-82.

[25] General Statutes § 5-192o (c) provides in relevant part: "A member of tier II who has completed twenty-five years of credited service while a hazardous duty member shall be vested in his retirement benefit under section 5-192n. . . ."

We assume, without deciding, that, if the defendant had become disabled after completing twenty-five years of credited service, he would have been eligible for hazardous duty retirement under § 5-192n rather than disability retirement under § 5-192p.

time before the defendant suffered a disability.[26] We conclude, therefore, that, consistent with *Bender*, the defendant's interest in future disability benefits is far too speculative to be considered property subject to equitable distribution.

Furthermore, such an interest, even if it was sufficiently concrete to constitute distributable property, could not be classified as distributable under the facts of this case. A benefit derived from an injury occurring years after dissolution, meant solely to compensate for the loss of future wages, simply does not represent the "fruits" of the marital partnership that § 46b-81 is designed to equitably parse. *Krafick* v. *Krafick*, supra, 234 Conn. 796. This view is not foreclosed by, and is indeed consistent with, our decision in *Lopiano* v. *Lopiano*, 247 Conn. 356, 752 A.2d 1000 (1998). In *Lopiano*, we held that an award of damages from a personal injury action was available, in its entirety, for equitable distribution because the plaintiff's personal injury case was decided, and his damages awarded, prior to the dissolution action. See id., 367. Although, after *Bender*, even a cause of action for personal injury existing *at the time of dissolution* might be considered a property interest subject to equitable distribution under § 46b-81, we conclude that our law does not require the inequity of treating damages awarded for personal injuries suffered well after dissolution as property subject to distribution.

The difficulty with the present case is that the defendant's "retirement disability" is, in effect, a hybrid of

---

[26] We note that, the concurring and dissenting justice's view notwithstanding, the *likelihood* that the legislature would decide to modify or terminate the disability benefits conferred by § 5-192p is irrelevant to our analysis. See footnote 8 of the concurring and dissenting opinion. What is relevant is the fact that the legislature is not barred from terminating such benefits, and that the nondisabled employee is without recourse if the legislature chooses to do so.

two conceptually distinct interests. We conclude that, as of the date of the parties' dissolution, the portion of the defendant's retirement benefit attributable to his actual years of service—and, therefore, properly characterized as deferred compensation—is distributable as marital property. See, e.g., *Thompson* v. *Thompson*, 183 Conn. 96, 100–101, 438 A.2d 839 (1981) (pension benefits not too uncertain or speculative to be considered property subject to distribution). This conclusion is consistent with our reasoning in *Bender*, as the receipt of regular pension benefits represents, at least in part, deferred compensation earned during the marriage, the value of which is quantifiable at the time of dissolution to a reasonable degree of certainty. On the other hand, we conclude that the portion of the defendant's benefit attributable to the additional amount that he receives as a consequence of being disabled was too speculative at the time of dissolution to be considered distributable property under § 46b-81, and was in no way earned during the course of the marriage. See *Perritt* v. *Perritt*, 54 Conn. App. 95, 97, 730 A.2d 1234 (1999) ("[a] disability payment is a payment in lieu of wages and a substitute for the income that would have been earned by the recipient").

The defendant's disability benefit is akin to income subject to adjustment under § 46b-82 and, therefore, is not property. The defendant's disability plan is noncontributory and can be amended at any time prior to the disability. It can commence within minutes of hiring and extend a lifetime and thus cannot be characterized as deferred income, which assumes the qualities of an asset. In fact, it would violate the logic of *Krafick* and *Bender* to characterize the defendant's disability benefits as an asset.

In the present case, the record indicates that the defendant was entitled to receive $990 per month in regular retirement benefits at the time of his injury.

Once his application for disability retirement was approved, that amount increased to $2382.30 per month, reflecting the disability enhancement. Our precedents, together with the policy underlying § 46b-81 and simple common sense, require us to treat the $990 as distributable property, and the difference, $1392.30, as nondistributable property. Therefore, pursuant to the judgment of dissolution, the plaintiff is entitled to 40 percent of the defendant's regular retirement benefits but is not entitled to a percentage of the defendant's disability benefits.

The judgment is reversed and the case is remanded with direction to render judgment granting the defendant's motion for clarification and to issue modified financial orders according to law.

In this opinion ROGERS, C. J., and SCHALLER, J., concurred.

NORCOTT, J., with whom KATZ, J., joins, concurring and dissenting. Although I concur with parts I and II A of the majority opinion, as well as the majority's discussion of the relationship between General Statutes §§ 46b-81 and 46b-82 in part II B of its opinion, I respectfully dissent from the majority's ultimate conclusion in part II B. In my view, we are not called upon in this appeal to determine which method of distributing marital assets would have been the most appropriate in the circumstances of this case. Rather, we are required to decide the limited question of whether § 46b-81, as it has been interpreted by this court, authorized the trial court to distribute the disability retirement benefits (disability benefits) of the defendant, Darrell D. Mickey, that were awarded under General Statutes § 5-192p[1] as

---

[1] General Statutes § 5-192p (a) provides: "If a member of tier II, while in state service, becomes disabled as defined in subsection (b) of this section, prior to age sixty-five, he is eligible for disability retirement if the member has completed at least ten years of vested service. If a member of tier II, while in state service, becomes so disabled as a result of any injury received while in the performance of his duty as a state employee, he is eligible for disability retirement, regardless of his period of state service or his age."

part of its financial orders. In determining that the trial court did not have that authority, the majority concludes that the defendant's interest in his disability benefits did not constitute an enforceable property right at the time of dissolution under the first prong of *Bender* v. *Bender*, 258 Conn. 733, 748–49, 785 A.2d 197 (2001), because: (1) the defendant did not have an enforceable right to the disability benefits unless and until he became disabled; and (2) the legislature could have modified or terminated the disability retirement program at any time prior to the defendant becoming disabled. In my view, however, our prior precedents and the language of § 5-192p make the defendant's interest in his disability benefits property under the first prong of *Bender* because the defendant had an enforceable and irrevocable right to those benefits as of the first day of his employment with the state, despite the fact that his receipt and future enjoyment of those benefits was contingent on him subsequently becoming disabled. Accordingly, I respectfully dissent.

As an initial matter, I note that I agree with the majority that, under the first prong of the *Bender* analysis,[2] our cases generally have classified property interests by characterizing them as either presently existing and enforceable, and thus distributable, or as mere expectancies that are immune from distribution. See id., 748. My primary disagreement with the majority relates to the analysis that we employ to make that determination,

[2] As the majority notes, our decision in *Bender* articulated a two step framework for determining whether an interest is property distributable under § 46b-81. Under the first prong, the analysis of which remains governed by our pre-*Bender* line of cases, we examine whether the party has a presently existing enforceable right to the benefits at the time of dissolution. See *Bender* v. *Bender*, supra, 258 Conn. 748. Only if the interest fails that test do we move to the second prong of the *Bender* analysis, wherein we examine whether the likelihood that the party will obtain an enforceable right to those benefits in the future is sufficiently concrete for the interest to be characterized as marital property. See id., 749–50.

as well as the application of that analysis to the benefits in the present case. Specifically, although our focus under the first prong of *Bender* is to determine whether the right to the benefit is presently existing and enforceable at the time of dissolution; see id.; that does not mean that the party must have the right to immediate *receipt* and *enjoyment* of the benefit, or even an unconditional guarantee that the benefit will be received at all. Rather, when the receipt of the benefit associated with a particular interest is contingent on the occurrence of a future event, that interest will nevertheless be considered marital property under our current case law if, at the time of dissolution, the party has an enforceable right to receive the benefit in the event that the condition *does* occur. See *Smith* v. *Smith*, 249 Conn. 265, 286, 752 A.2d 1023 (1999); *Bornemann* v. *Bornemann*, 245 Conn. 508, 517–18, 752 A.2d 978 (1998); *Krafick* v. *Krafick*, 234 Conn. 783, 797, 663 A.2d 365 (1995).

In *Smith* v. *Smith*, supra, 249 Conn. 268, for example, we addressed the question of whether a potential settlement award arising from the breach of a severance agreement was property subject to distribution as part of the dissolution judgment. We concluded that, even though the award could not have been received unless and until the pending civil action was successfully resolved in the defendant's favor, the interest in that potential award was marital property at the time that the parties agreed to distribute their property[3] because the defendant had an enforceable right to receive the award in the event that the action *was* successful. Id.,

---

[3] I note that the trial court in *Smith* determined, and we agreed, that the defendant's interest in the settlement award was marital property *at the time that the parties agreed to distribute their property* in 1990, at which time it remained unclear whether she was entitled to receive that award, even though the marriage was not actually dissolved until after the award was received in 1995. See *Smith* v. *Smith*, supra, 249 Conn. 270–71 and n.7, 286.

286. Similarly, in *Bornemann* v. *Bornemann*, supra, 245 Conn. 510, we addressed the question of whether unvested stock options, granted as part of a termination agreement, were distributable as marital property. We concluded that they were distributable because, "[a]lthough the defendant's failure to abide by the conditions contained in the [termination] agreement would have constituted a breach of the agreement that might have resulted in forfeiture of the stock options," the defendant had a right to receive those options as long as those conditions were satisfied. Id., 518. In addition, in *Krafick* v. *Krafick*, supra, 234 Conn. 785, we addressed the question of whether vested, but unmatured pension benefits were distributable property. In concluding that they were, we recognized that "vested pension benefits represent an employee's right to receive payment in the future, *subject ordinarily to his or her living until the age of retirement. The fact that a contractual right is contingent upon future events does not degrade that right to an expectancy.*" (Emphasis added; internal quotation marks omitted.) Id., 797.

Thus, our decisions in *Smith*, *Bornemann* and *Krafick* make clear that, although the receipt of a benefit is contingent on a future event, and although the benefit may not be received unless and until that event actually occurs, the interest is not reduced to a mere expectancy as long as the party has an enforceable right to receive the benefit in the event that the condition *does* occur. Moreover, those cases demonstrate that the likelihood that the condition precedent to receipt of the benefit will occur is not relevant to our analysis under the first prong of *Bender*. In *Smith*, for example, we did not in any way address the likelihood that the defendant's cause of action would be successful, and, indeed, it would have been almost impossible for the trial court to have made such a determination without trying the breach of severance action itself in the context of the

dissolution proceedings. Similarly, in *Bornemann* we did not examine the likelihood that the defendant could or would adhere to the conditions in the termination agreement, and it would have been entirely speculative for the trial court to have engaged in such an examination given the number of future events and contingencies that could have impacted the defendant's adherence to that agreement.

Applying the analysis in these precedents to the present case, therefore, I would conclude that the defendant's interest in his disability benefits was distributable property. The language of § 5-192p (a) expressly provides that "[i]f a member of tier II, while in state service, becomes . . . disabled as a result of any injury received while in the performance of his duty as a state employee, he is eligible for disability retirement, *regardless of his period of state service or his age.*" (Emphasis added.) Thus, from the moment the defendant began his employment with the state, he had an enforceable right to receive disability benefits in the event that he subsequently suffered a disabling injury within the scope of his employment. That right was both presently existing and enforceable from that time on, and, had the defendant become disabled on his first day of work, he would have been entitled to receive disability benefits without precondition. As *Smith, Bornemann* and *Krafick* make clear, the mere fact that the receipt and future enjoyment of such benefits was contingent on the defendant becoming disabled in the first place does not mean that his interest was a mere expectancy.[4] Moreover, the fact that the contingency

[4] The majority implies that the condition that the defendant become disabled is "a contingency on which acquisition of the property interest *itself* hinges," rather than "[a] contingency on which the mere *enjoyment* of a property interest depends . . . ." (Emphasis in original.) I respectfully disagree. Section 5-192p did not require the defendant to satisfy any conditions or wait any period of time before he became eligible to enforce his interest in disability benefits in the event that he became disabled while on the job. Thus, in my view, the statutory right to such benefits was obtained and

was unlikely to occur is not relevant to our analysis under the first prong of *Bender*, which focuses on whether he had a right to such benefits in the event that the contingency *did* occur. See *Smith* v. *Smith*, supra, 249 Conn. 286; *Bornemann* v. *Bornemann*, supra, 245 Conn. 518. Accordingly, in light of our prior precedents and the clear language of § 5-192p, I would conclude that the defendant's interest in his disability benefits was marital property under the first prong of *Bender* because, at the time of dissolution, he had an enforceable right to those benefits in the event that he subsequently became disabled, even though he could not actually have received those benefits unless and until that contingency occurred.

The majority also concludes that the defendant's interest was not marital property under the first prong of *Bender* because the disability benefit program could have been revoked by the legislature at any time prior to the defendant becoming disabled, implying that the defendant's interest in those benefits did not, and could not, vest until that time. In my view, however, the language of § 5-192p indicates that the defendant's interest had in fact vested[5] as of the first day of his employment

became enforceable immediately upon the defendant's employment with the state. By contrast, the defendant's disability merely triggered his receipt and future enjoyment of those benefits, and did not relate to the question of whether he had a right to such benefits in the event that the contingency, namely, his disability, did occur. See *Travelers Ins. Co.* v. *Pondi-Salik*, 262 Conn. 746, 755, 817 A.2d 663 (2003) ("[d]isability operates only to accelerate the employee's qualification for retirement benefits under § 5-192p").

[5] I note that several jurisdictions have concluded that, if the language of the applicable plan document or statutory provision so provides, interests in disability benefits may vest prior to the date of disability. See, e.g., *Washington* v. *Murphy Oil USA, Inc.*, 497 F.3d 453, 457 (5th Cir. 2007) (employee's interest in disability benefits vested after five years of service based on language of summary plan description, even though employee did not become disabled until almost nine years after beginning employment); *Dickey* v. *Retirement Board of San Francisco*, 16 Cal. 3d 745, 749, 548 P.2d 689, 129 Cal. Rptr. 289 (1976) (relying on distinction between irrevocable *right* to potential disability benefits and possibility that benefits would not be *received* because employee may not become disabled to conclude that

with the state, and could not have been revoked by the legislature at any time thereafter.

Specifically, § 5-192p (a) provides that "[i]f a member of tier II, while in state service, becomes disabled . . . prior to age sixty-five, he is eligible for disability retirement if the member has *completed at least ten years of vested service.* If a member of tier II, while in state service, becomes so disabled as a result of any injury received while in the performance of his duty as a state employee, he is eligible for disability retirement, *regardless of his period of state service or his age."* (Emphasis added.) Thus, the legislature has created two different kinds of disability benefits, each of which has a different prescribed period of "vesting service" before the interest vests and becomes irrevocable, even though the receipt of such benefits in both instances

---

disability benefits vested upon acceptance of employment); *Gatewood* v. *Board of Retirement of the San Diego County Employee's Retirement Assn.,* 175 Cal. App. 3d 311, 319, 220 Cal. Rptr. 724 (1985) (public employee's interest in disability pension benefits vested upon employee's acceptance of employment with state); *Welter* v. *Milwaukee,* 214 Wis. 2d 485, 490–91, 571 N.W.2d 459 (1997) (based on statutory language, municipal employee's interest in disability benefits vested upon acceptance of employment), review denied, 217 Wis. 2d 519, 580 N.W.2d 689 (1998); see also *Feifer* v. *Prudential Ins. Co. of America,* 306 F.3d 1202, 1212–13 (2d Cir. 2002) (concluding that disability benefits vested *no later* than date of disability with respect to two plaintiffs, and remanding case to determine if benefits vested *prior* to date of disability with respect to third plaintiff). I also acknowledge, however, that other jurisdictions have concluded that an interest in disability benefits does not vest until the date of disability. See, e.g., *Kestler* v. *Board of Trustees of North Carolina Retirement System,* 48 F.3d 800, 804 (4th Cir.) (disability retirement benefits do not vest until date of disability), cert. denied, 516 U.S. 868, 116 S. Ct. 186, 133 L. Ed. 2d 124 (1995); *Fund Manager, Public Safety Personnel Retirement System* v. *Phoenix Police Dept. Public Safety Personnel Retirement System Board,* 151 Ariz. 487, 490, 728 P.2d 1237 (App. 1986) (right to accidental disability pension does not vest until employee becomes disabled); *Branson* v. *Public Employees' Retirement Fund,* 538 N.E.2d 11, 12 (Ind. App. 1989) (based on statutory language, right to *all* pension benefits, including normal retirement benefits and accidental disability benefits, does not vest until all statutory requirements have been satisfied and employee can demand immediate receipt of benefit).

remains contingent on the employee subsequently becoming disabled.[6]

Indeed, this conclusion is supported by the similarity between the vesting language of § 5-192p and that of General Statutes § 5-192*l*, which provides for normal retirement benefits that the majority properly considers to have vested in the present case. More specifically, § 5-192*l* (a) provides that "[e]ach member of tier II *who has attained age sixty-five and has completed ten or more years of vesting service* may retire on his own application on the first day of any future month named in the application." (Emphasis added.) Thus, although neither § 5-192p nor § 5-192*l* explicitly references the legislature's ability to revoke the respective interest,[7] both statutes specify a required period of vesting service before the employee becomes eligible to enforce his interest in the particular benefit once all of the pre-scribed conditions are satisfied, namely, a ten year vest-ing period for normal retirement benefits and either a ten year vesting period with respect to disability bene-fits for an injury sustained outside the scope of employ-ment, or, alternatively, immediate vesting for injuries suffered while on the job. Similarly, the receipt of the benefit in both instances is contingent on, and, indeed, the benefit may not be received until, the occurrence of a prescribed future event, namely, the employee becoming disabled for disability benefits and the employee surviving until the age of sixty-five for normal retirement benefits. Based on these similarities, there-fore, I am unable to distinguish between the language of the two statutes as far as the vesting or revocability

[6] The majority acknowledges that an interest may be vested, and thus distributable, even though it has not yet matured in the sense that the benefit cannot be received unless and until certain prescribed conditions occur. See *Krafick* v. *Krafick*, supra, 234 Conn. 797.

[7] I presume that the majority would not dispute that an interest in disability benefits under § 5-192p would be considered vested and irrevocable if the language of that statute explicitly so provided.

of the respective interest is concerned. Thus, if the majority considers the "ten or more years of vesting service" language of § 5-192*l* to render that interest irrevocable after ten years, which I agree that it does, I see no reason to construe the "at least ten years of vested service" or the "regardless of his period of state service or his age" language of § 5-192p as having a different effect. Accordingly, I would conclude that the defendant's interest in disability benefits with respect to injuries sustained within the scope of his employment became irrevocable upon his employment with the state.[8]

Finally, I briefly note my disagreement with the majority's conclusion that the defendant's interest in disability benefits did not constitute marital property because the injury occurred postdissolution and represents compensation for future lost wages. We have stated that whether an asset is marital property turns on the time at which an enforceable right to the particular benefit was obtained, and *not* on whether the benefits associated with the interest were received during the marriage. See *Bornemann* v. *Bornemann*, supra, 245 Conn. 529. Moreover, we have recognized that "[e]xam-

---

[8] In addition, even if the defendant's interest was not marital property under the first prong of *Bender* because that interest was subject to revocation by the legislature, we then would analyze that interest under the second prong of *Bender*, wherein our inquiry properly would focus on the likelihood that an enforceable right to such benefits would be obtained, or in this case retained, and not on whether the benefits were likely actually to be *received*. See *Bender* v. *Bender*, supra, 258 Conn. 749–50 (analyzing likelihood that defendant would obtain enforceable right to unvested pension benefits, and not likelihood that such benefits subsequently would be received). Because in my view it is exceedingly unlikely that the legislature would revoke a statutory entitlement, the assurance of which undoubtedly was central to the decision of thousands of state employees who have chosen to pursue careers in state government that entail significant health and safety risks, I would conclude that the likelihood that the defendant would retain his enforceable right to disability benefits was sufficiently concrete to satisfy the second prong of *Bender*.

ining what an asset is intended to reflect is significant . . . only as it relates to whether [an enforceable right to the] asset was earned prior to or subsequent to the date of dissolution." *Lopiano* v. *Lopiano*, 247 Conn. 356, 367 n.5, 752 A.2d 1000 (1998); see also *Bender* v. *Bender*, supra, 258 Conn. 752 ("[t]he fact that a portion of the pension benefits, once vested, will represent the defendant's service to the fire department after the dissolution does not preclude us from classifying the entire unvested pension as marital property"). Because in my view the defendant obtained an enforceable interest in his disability benefits under our current case law from the moment he began working for the state, I do not believe that the fact that those benefits were received after the marriage had been dissolved or that they represent, in part, compensation for future lost wages is relevant to our analysis.

Accordingly, I conclude that the defendant had an enforceable right to disability benefits at the time of dissolution under the first prong of *Bender*, and, therefore, those benefits constituted marital property subject to distribution under § 46b-81. Because I would affirm the judgment of the trial court, I respectfully dissent.