******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., dissenting. In *Bender* v. *Bender*, 258 Conn. 733, 749, 753–54, 785 A.2d 197 (2001), and its progeny, we eschewed a formalistic legal definition of the term "property" in General Statutes § 46b-81,[1] concluding that, in divorce proceedings, the legislature intended "a spectrum of interests that do not fit comfortably into our traditional [property] scheme . . . [to] be available in equity for courts to distribute." *Mickey* v. *Mickey*, 292 Conn. 597, 625, 974 A.2d 641 (2009). Our jurisprudence establishes that retirement benefits—whether vested or unvested, funded or unfunded, contributory or non-contributory—generally constitute property subject to equitable distribution because, "as a practical matter," the parties' expectation of receiving these benefits "is sufficiently concrete, reasonable and justifiable as to constitute a presently existing property interest for equitable distribution purposes." *Bender* v. *Bender*, supra, 749; see also *Reville* v. *Reville*, 312 Conn. 428, 445–46, 93 A.3d 1076 (2014) (unvested, unfunded, non-contributory pension plan subject to discontinuation or alteration was not excluded from definition of property); *Bender* v. *Bender*, supra, 749 (unvested pension benefits constituted property); *Krafick* v. *Krafick*, 234 Conn. 783, 795, 663 A.2d 365 (1995) (vested pension benefits constitute property "[w]hether the plan is con-

---

[1] General Statutes § 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage . . . the Superior Court may assign to either spouse all or any part of the estate of the other spouse. . . .

\* \* \*

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

tributory or noncontributory" (internal quotation marks omitted)). Until today, we have never excluded an expected stream of future retirement benefits acquired during the life of a marriage from the definition of property subject to equitable distribution pursuant to § 46b-81.

Our prior precedent holds that retirement benefits generally constitute marital property due to the unique nature of these benefits and the important economic role that they serve. More particularly, we have categorized retirement benefits as property because "employers and employees treat [them] as property in the workplace"; *Bender* v. *Bender*, supra, 258 Conn. 750; they "represent a form of deferred compensation for services rendered" during the marriage; (internal quotation marks omitted) id.; they "are significant marital assets"; id., 752; and "they represent the fruits of the marital partnership in practical and emotional ways . . . ." Id., 754. Our jurisprudence is consistent with the "broad general consensus [among our sister states] that retirement plans of all types do constitute property" subject to equitable distribution at the time of divorce. (Emphasis omitted.) 2 B. Turner, Equitable Distribution of Property (3d Ed. 2005) § 6:22, p. 135.

Despite this foundational understanding about the nature and function of retirement benefits, the majority concludes that the retirement benefits at issue in this case do not constitute marital property within the meaning of § 46b-81 because, among other things, they "will never vest" and "may be unilaterally revoked by a third party at any time." According to the majority, the touchstone of the property inquiry is whether "the holder *eventually* will acquire an enforceable right in the interest, that is, whether the interest will likely vest or whether the holder will otherwise acquire a definitive right to it." (Emphasis in original). Part I B of the majority opinion. In my view, the majority's conclusion that an irrevocable, vested, and enforceable legal right is the sine qua non of marital prop-

erty under § 46b-81 is inconsistent with the fundamental principles underlying *Bender* and its progeny. See *Bender* v. *Bender*, supra, 258 Conn. 753 (rejecting notion that "enforceable contract rights" are "the sine qua non of 'property' under § 46b-81"). In the present case, the evidentiary record discloses that the retirement benefits at issue were unquestionably the fruits of the marital partnership and that the parties' expectation of receiving those benefits as a practical matter was the very opposite of speculative, and certainly was "sufficiently concrete, reasonable and justifiable as to constitute a presently existing property interest for equitable distribution purposes." Id., 749. I therefore dissent.[2]

The categorization of an interest as marital property under § 46b-81 proceeds in three stages, asking, "first, whether the resource is property within § 46b-81 to be equitably distributed (classification); second, what is the appropriate method for determining the value of the property (valuation); and third, what is the most equitable distribution of the property between the parties (distribution)." (Internal quotation marks omitted.) Id., 740. The present appeal is focused exclusively on the first stage of the analysis, classification, and we must determine whether the retirement payments at issue correctly were classified as falling outside the statutory definition of "property" in § 46b-81. As the majority correctly points out, this is a mixed question of law and fact. See part I

---

[2] Because the trial court's legal error in categorizing the retirement payments as nonproperty necessarily affects its award of those payments as alimony, I need not address the claim on appeal challenging the trial court's alimony award. See part II of the majority opinion; see also *Tuckman* v. *Tuckman*, 308 Conn. 194, 214, 61 A.3d 449 (2013) ("We previously have characterized the financial orders in dissolution proceedings as resembling a mosaic, in which all the various financial components are carefully interwoven with one another. . . . Accordingly, when an appellate court reverses a trial court judgment based on an improper alimony, property distribution, or child support award, the appellate court's remand typically authorizes the trial court to reconsider all of the financial orders." (Internal quotation marks omitted.)).

A of the majority opinion. We review the facts found by the trial court for clear error, but the ultimate issue of classification is a legal one subject to de novo review. See id.; see also *Reville* v. *Reville*, supra, 312 Conn. 446; *Mickey* v. *Mickey*, supra, 292 Conn. 613. See generally *Crews* v. *Crews*, 295 Conn. 153, 164, 989 A.2d 1060 (2010) ("[w]hen the trial court conducts a legal analysis or considers a mixed question of law and fact, plenary review is appropriate, even in the family law context").

"The term 'property' is not defined in § 46b-81 or elsewhere in the [relevant statutory scheme]." *Krafick* v. *Krafick*, supra, 234 Conn. 794. We have held that this term must be construed broadly to effectuate the legislative purpose of the equitable distribution statutes, which "is to recognize that marriage is, among other things, a shared enterprise or joint undertaking in the nature of a partnership to which both spouses contribute—directly and indirectly, financially and nonfinancially—*the fruits of which* are distributable at divorce." (Emphasis in original; internal quotation marks omitted.) Id., 795; see also *Bornemann* v. *Bornemann*, 245 Conn. 508, 515–16, 752 A.2d 978 (1998) ("in enacting § 46b-81, the legislature acted to expand the range of resources subject to the trial court's power of division, and did not intend that property should be given a narrow construction").

*Bender* and its progeny reject the formalistic legal criteria traditionally used to determine the existence of a property interest. The "legislative purpose [animating § 46b-81] counsels against interpreting the term 'property' so as to be strictly limited to the confines of traditional property law, defined solely by enforceable contract rights, to the exclusion of other interests that . . . are appropriately recognized as property within the marital context." *Bender* v. *Bender*, supra, 258 Conn. 753. As *Bender* makes clear, a "presently enforceable" right to an asset under traditional property or contract principles is "*not* the sine qua non of property under § 46b-81."

(Emphasis added; internal quotation marks omitted.) *Mickey* v. *Mickey*, supra, 292 Conn. 625. Although a legally enforceable right may be "*sufficient* for purposes of § 46b-81, [it] is not *necessary*." (Emphasis in original.) Id., 629. The definition of property is expansive and includes "a spectrum of interests that do not fit comfortably into our traditional [property] scheme and yet [are] available in equity for courts to distribute." Id., 625. An "unconventional" or "inchoate" interest contingent on the happening or nonhappening of future events may constitute distributable property under § 46b-81 if the contingency is not "overly speculative." (Internal quotation marks omitted.) Id.; see, e.g., *Tilsen* v. *Benson*, 347 Conn. 758, 804, 806 n.26, 299 A.3d 1096 (2023) (under *Bender* and its progeny, net distributions historically made by limited partnership to plaintiff were property for purposes of § 46b-81, even though plaintiff had no enforceable right to receive distributions under partnership agreement). An inchoate interest is not overly speculative if, "as a practical matter," a party's expectation of receiving the property "is sufficiently concrete, reasonable and justifiable as to constitute a presently existing property interest for equitable distribution purposes." *Bender* v. *Bender*, supra, 749.

Utilizing this analytical framework, we concluded in *Bender* that "unvested pension benefits are not too speculative to be considered property subject to equitable distribution under § 46b-81." Id. Such benefits properly are categorized as marital property because "employers and employees treat retirement benefits as property in the workplace," and because they "represent a form of deferred compensation for services rendered . . . ." (Citation omitted; internal quotation marks omitted.) Id., 750. "Most retirement plans permit the employee to take a reduction in present salary in exchange for increased future retirement benefits, and employees frequently make use of these provisions. Likewise, employers frequently use lucrative retirement packages

in lieu of additional salary to attract and retain desirable employees. If retirement benefits were truly only [a mere expectancy], employers and employees would not treat them as a substitute for present wages." (Internal quotation marks omitted.) Id., 750–51. Retirement benefits, regardless of funding source and vesting status, "represent a trade-off for potentially higher wages not earned during the marriage; they often represent . . . the only or principal material asset; and . . . they represent the fruits of the marital partnership in practical and emotional ways . . . ." Id., 754. For this reason, "any uncertainty regarding vesting is more appropriately handled in the valuation and distribution stages, rather than in the classification stage." Id., 749–50.

In arriving at our holding in *Bender*, we noted that "our conclusion is also consistent with the majority of other appellate courts that have addressed this issue." Id., 751 n.8; see id. (citing cases). Indeed, my research reveals that, "[e]xcept for Indiana[3] and Arkansas,[4] all American jurisdictions now treat both vested and unvested pensions as property." (Emphasis omitted; footnotes altered.) 2 B. Turner, supra, § 6:22, pp. 137–39. The overwhelming majority of states recognize that retirement benefits acquired during marriage constitute marital property, regardless of funding structure or vesting status, because "employees frequently decide to [forgo] present salary in exchange for future retirement benefits. Salary earned during the marriage, of course, is marital property. If pensions do not constitute property,

[3] In Indiana, property is defined by statute in relevant part as "a present right to withdraw pension or retirement benefits" or "the right to receive pension or retirement benefits that are not forfeited upon termination of employment or that are vested (as defined in Section 411 of the Internal Revenue Code) but that are payable after the dissolution of marriage . . . ." Ind. Code Ann. § 31-9-2-98 (b) (1) and (2) (LexisNexis 2019).

[4] See, e.g., *Pelts* v. *Pelts*, 514 S.W.3d 455, 457 (Ark. 2017) (retirement benefit "contingent on continued employment is too speculative to be vested and subject to division").

then spouses who own [retirement benefits] would have a powerful incentive to exchange marital property salary for separate property [retirement benefit] rights. The result would work substantial prejudice on [non-owning] spouses, as the courts would essentially be forced to tolerate dissipation of the marital estate. As long as the workplace continues to permit and even favor exchanges of salary for retirement benefits, there are substantial practical problems in treating only one side of the exchange (salary) as marital property." (Emphasis omitted.) Id., pp. 133–34.

Despite the foregoing authority, the majority relies on *Mickey* v. *Mickey*, supra, 292 Conn. 597, to conclude that the heart of the property inquiry is not whether retirement benefits should be available for distribution by trial courts in accordance with the equitable circumstances prevailing in any particular case but, rather, whether the holder of the benefit has or will "[obtain] an enforceable right in the interest." Part I B of the majority opinion. The majority retreats from the "nuanced approach" that we adopted in *Bender* and returns to a "traditional, fairly rigid" definition of property; *Mickey* v. *Mickey*, supra, 625; concluding that the focus of the property inquiry "is on the likelihood that the holder *eventually* will acquire an enforceable [legal] right in the interest, that is, whether the interest will likely vest or whether the holder will otherwise acquire a definitive right to it." (Emphasis in original.) Part I B of the majority opinion. The majority's conclusion is inconsistent with *Mickey* and our subsequent case law.

*Mickey* did not involve retirement benefits accrued during a marriage, which generally satisfy the statutory definition of property. Indeed, in *Mickey*, we explicitly reaffirmed the abiding principle that "deferred compensation" earned during a marriage "assumes the qualities of an asset" and, therefore, "is distributable as marital property." *Mickey* v. *Mickey*, supra, 292 Conn. 632.

Instead, the issue on appeal in *Mickey* was whether disability benefits resulting from injuries sustained after the end of a marriage satisfy the statutory definition of property. Id., 599. We held that "*disability* benefits awarded under General Statutes § 5-192p as a result of a disability incurred *after* a marriage has been dissolved [do not] constitute distributable marital property under . . . § 46b-81." (Emphasis added; footnote omitted.) Id.; see id., 600. Our reasoning was twofold. First, disability benefits for an injury that occurred after the end of a marriage, unlike retirement benefits acquired during the life of a marriage, are too speculative at the time of the dissolution to constitute distributable marital property under § 46b-81. We reasoned that "[a] potential disability is, by its very nature, an accidental event that every employee and employer strives to avoid. It is difficult to perceive how a property interest tied to such an occurrence is sufficiently concrete, reasonable and justifiable . . . to treat any benefits that *might* accrue, *if* the accident eventually occurs *and* is serious enough to cause permanent disability, as a presently existing property interest eligible for equitable distribution at the time of dissolution." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 630. Second, "[a] benefit derived from an injury occurring years after dissolution, meant solely to compensate for the loss of future wages, simply does not represent the fruits of the marital partnership that § 46b-81 is designed to equitably parse." (Internal quotation marks omitted.) Id., 631. Thus, we concluded that postdissolution disability benefits are not fruits of the marriage and do not constitute property. Nothing in *Mickey* requires deferred compensation acquired during the marriage to be or to eventually become vested or irrevocable.

The majority's conclusion also is inconsistent with our recent decision in *Tilsen* v. *Benson*, supra, 347

Conn. 758, in which we held that discretionary distributions from a family limited partnership constitute divisible marital property, even when there is no enforceable or definitive right to receive those distributions. See id., 804–807. The plaintiff in *Tilsen*, Jon-Jay Tilsen, was a limited partner in a family partnership that historically had made annual distributions to its partners, including Tilsen, but Tilsen had no role in the management of the business and no enforceable right to receive the discretionary distributions. See id., 764, 795, 804–805. We nonetheless determined that the distributions were property subject to equitable distribution under § 46b-81 in light of the trial court's "unchallenged findings that the parties have regularly received the . . . distributions since 1997 and have relied on them as part of their budget, particularly as a source of retirement savings." Id., 806 n.26. The distributions were a marital asset, and Tilsen's "interest in the . . . distributions [was], 'as a practical matter . . . sufficiently concrete, reasonable and justifiable as to constitute a presently existing property interest for equitable distribution purposes.' " Id.; see also id. (quoting *Bender* v. *Bender*, supra, 258 Conn. 749, and citing to *Mickey* v. *Mickey*, supra, 292 Conn. 628, among other cases, in support of this holding).[5] Our holding in *Tilsen* is consistent with

---

[5] The majority incorrectly characterizes this aspect of *Tilsen* as dictum and incorrectly states that I "[gloss] over the fact that this court never determined that the interest at issue in *Tilsen* was property." Part I C of the majority opinion. Our analysis of whether the discretionary distributions constituted property was not dictum. "Dictum includes those discussions that are merely passing commentary . . . those that go beyond the facts at issue . . . and those that are unnecessary to the holding in the case. . . . [I]t is not dictum [however] when a court . . . intentionally takes up, discusses, and decides a question germane to, though not necessarily decisive of, the controversy . . . . Rather, such action constitutes an act of the court [that] it will thereafter recognize as a binding decision." (Internal quotation marks omitted.) *Cruz* v. *Montanez*, 294 Conn. 357, 376–77, 984 A.2d 705 (2009). In *Tilsen*, we intentionally took up, discussed, and decided an issue germane to the case. Notably, the parties in *Tilsen* did *not* stipulate that the discretionary distributions satisfied the statutory definition of property in § 46b-81. To the contrary, Tilsen argued on appeal that the trial court

"the theme running through this area of our jurisprudence, which . . . pays mindful consideration to the equitable purpose of our statutory distribution scheme, rather than to mechanically applied rules of property law. In order to achieve justice, equity looks to substance, and not to mere form." *Bender* v. *Bender*, supra, 751. The focus of the property analysis is not on eventual vesting per se; it is on the practical likelihood that the asset will be received and the nature of the asset in the context of the marital partnership.

Looking to the nature of the retirement payments at issue in this case, as our case law instructs, it is clear to me that they are a direct product of the parties' thirty-year marriage subject to equitable distribution under § 46b-81. The defendant, D. S., worked as a partner for her employer, a large international law firm, for twenty-three years prior to the dissolution of her marriage to the plaintiff, D. S. See footnote 6 of this opinion. The parties were married during all of those twenty-three years, and the retirement payments are deferred compensation for services rendered by the defendant while married. As such, the retirement payments plainly constitute the fruits of the parties' marital partnership. The fact that the retirement payments are unvested, noncontributory, and unfunded has no bearing on their inherent nature as marital assets because, regardless of the funding mechanism used to pay the benefits, they represent a trade-off of one type of marital property (current salary) in exchange for another type of marital property (future retirement benefits). See, e.g., *Mickey* v. *Mickey*,

improperly had categorized the distributions as property, and this court rejected that claim on the merits. See *Tilsen* v. *Benson*, supra, 347 Conn. 806 n.26. The parties stipulated that " 'the court shall have the right to make a determination as to what portion/percentage of such [partnership] distributions the [wife] is entitled.' " Id., 805. This stipulation recognized that the trial court had the authority to distribute the partnership distributions as part of its financial orders; it did not provide that those distributions were distributable as *property* (as opposed to alimony).

supra, 292 Conn. 632; *Bender* v. *Bender*, supra, 258 Conn. 754; *Krafick* v. *Krafick*, supra, 234 Conn. 794–95. To categorize the retirement payments as anything other than a divisible marital asset "would be to blink our eyes at reality." *Bender* v. *Bender*, supra, 752.

The record also establishes beyond any doubt that the defendant's expected receipt of the retirement payments is not overly speculative. Contrary to the majority's suggestion, my assessment in this regard is not based on my disagreement with the trial court about the evidentiary facts. See part I C of the majority opinion. The facts are the facts, and, in my estimation, there simply is no factual basis to support the trial court's conclusion that the defendant is unlikely to receive retirement benefits from her employer when she retires. All of the evidence indicates that she almost certainly will receive those benefits. As the author of a leading treatise on family law, Brett R. Turner, observes, the Appellate Court's decision in this case "reached the wrong result. [Although] the amount of benefits likely to be received was difficult to predict in advance, there was no evidence suggesting that the [defendant] was likely to receive nothing." 2 B. Turner, Equitable Distribution of Property (4th Ed. 2024) § 6:22; see *D. S.* v. *D. S.*, 217 Conn. App. 530, 536–45, 289 A.3d 236 (2023).

First, the defendant *currently* is eligible to receive these payments under the *existing* partnership agreement. At the time of trial, the defendant testified that she was "currently eligible for [the retirement] benefits" and that, if she were to retire today, she "would be entitled to payments under the [firm's] partnership agreement . . . ." Although the retirement benefits do not mature until after the defendant retires, her retirement is anything but a speculative, distant, and unforeseeable event. To the contrary, the defendant, who was fifty-seven years old at the time of trial, testified that the average retirement age at the firm was sixty and

that she planned to retire by age sixty-two "[a]t the latest
. . . ." The amount of the benefits at issue, moreover,
is anything but trivial; in 2016—when its profits per
partner were significantly less than they were at the
time of trial—the firm projected that, if the defendant
retired in 2025, her retirement payments would be
$1,458,000 annually.

Second, the record demonstrates that the defendant's
law firm has never once failed to make retirement pay-
ments to an eligible retired partner. Past performance
may not guarantee future results, but the firm's decades
long record of consistent performance, without excep-
tion, strongly indicates that the benefits are not "overly
speculative" from the perspective of a soon to be retired
senior partner such as the defendant. *Mickey* v. *Mickey*,
supra, 292 Conn. 625; see *Tilsen* v. *Benson*, supra, 347
Conn. 806 n.26 (discretionary distributions from limited
partnership were property subject to equitable distribu-
tion under § 46b-81 due to trial court's "unchallenged
findings that the parties have regularly received the
. . . distributions since 1997 and have relied on them
as part of their budget, particularly as a source of retire-
ment savings"). The realistic expectation of the receipt
of the retirement payments was supported not only by
the firm's past performance but also by its projected
future earnings. There was no evidence presented at
trial that the firm faced any realistic prospect of finan-
cial distress or insolvency in the foreseeable future.
Quite the opposite is true; the firm historically is one
of the most successful and prosperous law firms in the
world, and the evidence at trial established that it was
enjoying a period of increased profitability.[6] On this

[6] The parties agreed to various sealing orders in the trial court "on the
basis that revealing certain information would be detrimental to one or
more of the parties." *D. S.* v. *D. S.*, supra, 217 Conn. App. 532 n.1. The
Appellate Court amended those sealing orders but, "in the spirit of the trial
court orders and the parties' reliance on them, [did] not, in [its] opinion,
refer to either party or their children by name . . . [or] identify any of the
parties' past or present employers." Id., 532–33 n.1. The majority opinion

record, there is no reason to believe that the firm would have been unable to fund payments to retired partners.

Third, the pool of funds from which the retirement payments are made each year is capped at 30 percent of the firm's net profits, and the payment to each retired partner is capped at a specified percentage to further ensure that the ratio between the total retirement payments and the firm's net income is sustainable. These caps do not portend the cessation of the retirement payments; again, just the opposite is true. The caps are designed to ensure the *continued* fiscal health of the retirement program. As the evidence at trial demonstrated, in 2016, the firm presented a written report to the partnership, stating that it expected the caps to continue to maintain the fiscal stability of the firm over the next twenty-five years. The 2016 report, which the defendant herself presented to the partnership, expressly was intended to inform the partners what to expect of the firm's retirement plan over the next twenty-five years in light of the changes that had occurred over the past twenty-five years (primarily the firm's increased profitability and increased ratio of retired partners to active partners). "What does it mean for the [f]irm" and for "individual partners" over the next twenty-five years, asked the report. Its answer to the question was direct and unequivocal: "The cap will do what it is meant to do to avoid destabilizing the [f]irm." To ensure fiscal stability, the report warned that, "[o]ver the next [twenty-five] years, the [retirement] benefit cutback could be as much as 50 [percent] for partners with 10 [percent] caps." The report forecast a reduction in the amount of the retirement payments—it contains no sug-

follows suit, and I will not upset this arrangement by identifying the defendant's employer by name. I will observe, however, that the firm is among the most profitable law firms in the world, and anyone learning the identity of the defendant's employer would be shocked to hear that Connecticut courts have questioned the firm's financial future.

gestion, express or implied, that the retirement payments will be eliminated over the next twenty-five years.

Fourth, although it is true that the partnership agreement theoretically *could* be amended at some point in the future to terminate the firm's obligation to pay the retirement benefits altogether, the occurrence of such an amendment is pure speculation. There was no evidence that the partners ever have considered amending the partnership agreement to terminate the retirement payments, and it would not be easy to do so. Termination of the retirement payments would require a supermajority vote of at least three quarters of the partners having at least 75 percent of the points held by the equity partners. In the absence of any evidence indicating a realistic probability that a supermajority of the partners would coalesce to implement such a drastic and unprecedented change, the risk that these payments would be terminated rests on hypothetical conjecture without basis in fact.

To support its conclusion to the contrary, the majority relies heavily on the testimony of the defendant's expert witness, Mark Harrison. This reliance is misplaced because Harrison's opinion was based on nothing more than theoretical possibilities without any case-specific evidentiary support. Harrison read or paraphrased portions of the partnership agreement to the court and then speculated, with no factual basis, about possible future scenarios that may or may not one day occur. Harrison opined, for example, that the defendant's receipt of the retirement payments was speculative because the firm might one day become insolvent. However, this opinion had nothing to do with the firm's actual financial condition—Harrison acknowledged that he did not have access to the firm's financial records. Instead, his opinion was based solely on the fact that "twenty-two firms of almost [the same] size have disbanded or gone bankrupt since the financial crisis in 2007." After making this observation, Harrison was quick to add that "this is a wonderful firm. I don't

want to make it sound like it's not. [It has] been around for a long time, and [it is] as top-shelf as they come." Understood in context, it is apparent that Harrison's opinion testimony was not based on any analysis regarding the probability that this specific firm was at risk of insolvency or bankruptcy but, instead, on the possibility that a generic firm of a similar size might one day go out of business.[7] Such hypothetical scenarios and theoretical possibilities fail to apply the proper analysis under *Bender* and its progeny.

Although Harrison characterized the retirement payments as "the epitome of a mere expectancy," this testimony was entitled to no weight. Whether the defendant's interest in the retirement payments was a mere expectancy or sufficiently concrete, reasonable, and justifiable to constitute distributable property under § 46b-81 was the ultimate legal issue to be decided by the trial court, not a factual issue on which an expert witness may opine. See, e.g., *Updike, Kelly & Spellacy, P.C.* v. *Beckett*, 269 Conn. 613, 652 n.30, 850 A.2d 145 (2004) (agreeing that expert testimony "amounted to an improper legal opinion on the ultimate issue in the case"); *Kelly* v. *Waterbury*, 96 Conn. 494, 499–501, 114 A. 530 (1921) (expert witness was not permitted to testify as to ultimate legal issue of defendant's negligence); *Fuller* v. *Metropolitan Life Ins. Co.*, 70 Conn. 647, 677, 41 A. 4 (1898) (expert testimony on "[t]he meaning and legal effect of the [insurance] policy" was inadmissible because that issue "was a question of law for the court"); 1 R. Mosteller et al., McCormick on Evidence (8th Ed. 2020) § 16, p. 168–69 ("at common law courts do not allow opinion on a question of law,

---

[7] The majority seizes on Harrison's groundless conjectural musings about a financial collapse of the firm, but this aspect of Harrison's opinion has no value, and it would be clearly erroneous for a judge to rely on it in the present case without first learning much more about the past and present financial condition of the firm, as well as the various indicators of future performance used in the law firm industry, none of which was known to Harrison by his own admission.

unless the issue concerns foreign law" (footnote omitted)). To the extent that Harrison's opinion may be characterized as one of fact, it was devoid of the requisite case-specific evidentiary support. See, e.g., *Commissioner of Transportation* v. *Larobina*, 92 Conn. App. 15, 26, 882 A.2d 1265 ("[n]o weight may be accorded to an expert opinion [that] is totally conclusory in nature and [that] is unsupported by any discernible, factually based chain of underlying reasoning" (internal quotation marks omitted)), cert. denied, 276 Conn. 931, 889 A.2d 816 (2005); see also footnote 7 of this opinion. Harrison's expert testimony simply does not provide a basis to deem the likelihood of the defendant's receipt of the retirement payments overly speculative.[8]

To put the point directly, there is not a shred of factual evidence in this record to support a finding that there is a realistic possibility, much less a likelihood, that the defendant will be divested at any time in the foreseeable future of her current contractual right to receive the retirement payments. There is evidence to support a finding that her payments will be reduced between now and 2040 by as much as 50 percent, but, even with that reduction, her annual payments will approach $750,000 based on the firm's own projection.

In sum, the majority's legal determination that the retirement payments do not constitute marital property,

---

[8] I acknowledge that the retirement payments may be difficult, if not impossible, to value. Indeed, the trial court found that the value of the retirement payments could not be quantified at the time of trial and, therefore, was "a mere expectancy." As we explained in *Bender*, however, difficulties in valuation do not defeat the categorization of a marital resource as property under § 46b-81. See *Bender* v. *Bender*, supra, 258 Conn. 749–50 and n.7. For example, the trial court may account for the difficulties in valuation by awarding a percentage of the retirement payments instead of a lump sum or by distributing a portion of the retirement payments as alimony in lieu of property. See footnote 9 of this opinion. There are many tools at the trial court's disposal, but excluding the retirement payments entirely from the pool of marital assets subject to equitable division under § 46b-81 is not one of them.

as defined by § 46b-81, is unsupported by the factual record, inconsistent with our case law, and contrary to the legislature's intent "to expand the range of resources subject to the trial court's power of division . . . ." (Internal quotation marks omitted.) *Bender* v. *Bender*, supra, 258 Conn. 743. The majority's return to a traditional, rigid definition of property in § 46b-81—"defined solely by enforceable contract rights, to the exclusion of other interests that . . . are appropriately recognized as property within the marital context"—upsets settled precedent and is contrary to the legislative purpose animating our statutory scheme. Id., 753; see *Mickey* v. *Mickey*, supra, 292 Conn. 625. As Turner stated in his learned treatise, the rule adopted by the majority "poses a significant potential threat to the policy that retirement benefits earned during the marriage are marital property." 2 B. Turner, Equitable Distribution of Property (4th Ed. 2024) § 6:22. On the present factual record, the retirement payments plainly constitute marital property under § 46b-81, and, therefore, I would reverse the judgment of the Appellate Court upholding the decision of the trial court and remand for the entry of new financial orders.[9]

---

[9] I recognize that the trial court could have exercised its discretion to award a percentage of the retirement payments as alimony in lieu of property. See General Statutes § 46b-82 (a) ("[a]t the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other, in addition to or *in lieu of* an award pursuant to section 46b-81" (emphasis added)). To properly exercise its discretion, however, the trial court first must correctly categorize the retirement payments as property under § 46b-81. As we explained in *Krafick* v. *Krafick*, supra, 234 Conn. 783, "[§] 46b-81 requires a trial court to make an equitable distribution of the parties' *property*; to go about doing so sensibly, a court must determine at the outset which of the parties' resources are subject to division and assignment under that provision. Although § 46b-82 authorizes the trial court to award alimony 'in addition to or *in lieu of* [a distribution of property] pursuant to section 46b-81' . . . the trial court may decide to exchange alimony for property only *after* determining the value of the property in the estate." (Emphasis in original.) Id., 798 n.22.